(A.R.D. 185)

SUPERIOR MERCHANDISE COMPANY v. UNITED STATES

Entry Nos. 1762; 2720; 779.

First Division, Appellate Term

(Decided March 30, 1965)

*Stein & Shostak* (*Marjorie M. Shostak* of counsel) for the appellant.

*John W. Douglas*, Assistant Attorney General (*Samuel D. Spector*, trial attorney), for the appellee.

Before OLIVER, WILSON, and NICHOLS, Judges

NICHOLS, Judge: This is an application for review of a decision and judgment of Donlon, J., sustaining the appraised value of the merchandise. *Superior Merchandise Company* v. *United States*, 50 Cust. Ct. 508, Reap. Dec. 10539.

The merchandise is described on the invoices as "carnival necklets" and on the entries as "glass bead necklets" or "beaded articles necklets." It was exported from Czechoslovakia on July 17, July 22, and September 29, 1954, and was entered at the port of New Orleans at 18¼ cents per dozen, plus packing. It was appraised at 19½ cents per dozen, plus packing.

The parties are in agreement that the proper basis of appraisement is export value, as that value is defined in section 402(d) of the Tariff Act of 1930, and that there is no foreign value for the merchandise. The issue, therefore, is whether the appraised value or the entered value constitutes the statutory export value.

The trial court found that there was no issue as to "such or similar merchandise," or principal market, or that the prices contended for were prices for exportation to the United States. In holding that the appraised value was the proper dutiable value of the merchandise, it found that the price of 18¼ cents per dozen was not a "freely offered" price to all purchasers, but was a bargained price or the result of a tie-in sale with other merchandise. It further found that the record did not adequately show the usual wholesale quantity in which the merchandise was bought and sold. Appellant claims, however, that, at the time of exportation, the merchandise was freely offered to all purchasers at 18¼ cents per dozen and that the price did not vary with the quantity.

The reason for the controversy over such a small difference in valuation is that the merchandise is subject to another classification and a much higher rate of duty, if it is valued at over 20 cents per dozen pieces. (Paragraph 1527(a)(2) and 1503, Tariff Act of 1930, *A. W. Fenton Co.* v. *United States*, 1 Cust. Ct. 151, C.D. 40.) The appraised value would exceed 20 cents, with packing added.

According to the record, this merchandise is irregular goods produced out of surpluses and wrongly manufactured beads, sometimes described as "distress" merchandise. (Plaintiff's exhibit 9.) The articles are round necklaces made of beads and some items which the

witness did not consider to be beads. Some have a clasp, some a ring, some a wire, and some a snap, which serve as catches. They come in an assortment and are used for carnival throw-away purposes only. They are not available in an unlimited quanity. (Plaintiff's exhibit 9.)

The within merchandise was purchased after an extensive series of negotiations. On or about April 15, 1954, Jablonex Czechoslovak Export Co., Ltd. (hereinafter called Jablonex), the manufacturer, wrote to appellant stating that samples of throw-away necklets were being forwarded and enclosing a so-called pricelist. The latter is on Jablonex letterhead and is addressed to Superior Merchandise Company. It states, in part:

### Throw Away Assortment

We are sending you in sample parcel No. 124/1853 2 (two) dozen necklets, marked assortment No. 200 (two hundred) which we beg to offer you at the very favourable price of USA $0.19½ per 1 dozen singles. Kindly note that this price is to be understood for a minimum quantity of 10,000 dz.

Appellant received this in the regular course of business, rejected the offer, and made a counter-offer. In a letter, dated May 4, 1954, it was pointed out that prior purchases had been at $2.15 per gross, plus packing, and that the cost must come under 20 cents per dozen or the duty would be almost double. (Plaintiff's collective exhibit 2.) It was also stated that an order for 23,040 dozen to be shipped in 3 shipments was enclosed, but no such order is in evidence. Subsequently, Jablonex offered the merchandise at 18½ cents "rock bottom without cash discount." (Plaintiff's exhibit 3.) Superior replied that the price was satisfactory, but that it must have the usual cash discount otherwise the cost would be above the price limit. (Plaintiff's exhibit 4.) Jablonex then cabled:

\* \* \* IF COST AND PACKING AS MENTIONED AND WITHOUT CASH DISCOUNT COST WILL BE GUARANTEED UNDER TWENTY STOP DID OUR UTMOST BUT CANNOT DO MORE \* \* \*. [Plaintiff's exhibit 5.]

Superior replied that the figures showed a total cost of a fraction over 20 and suggested that, if the discount was impossible, that a price of 18¼ be tried. (Plaintiff's exhibit 6.) On May 18, Jablonex responded that it was entering an order for 23,040 dozen at 18¼, plus packing, making an average of 19.81 per dozen. (Plaintiff's exhibit 7, plaintiff's exhibit 8.)

Samuel E. Philipson, a partner in the appellant firm, testified that he had received subsequent offers from Jablonex at 18¼ cents, plus packing, or 19½ cents, including packing. He had never purchased at any other price since the date of the above negotiations. Between that date and September 1954, he had received an offer from an importer in New York, William Shaland, for Czechoslovakian beads at

18¼ cents per dozen, plus packing. He did not purchase as he had already placed orders for about 22,000 dozen.

An affidavit of Kvĕtoslav Bimr, sales manager of Jablonex, sworn to November 30, 1961 (plaintiff's exhibit 9), states:

That in 1954, we made some offers of our Carnival throw-away necklets at a price of 19½¢ per dozen, plus packing, but that no sales were made at this price. That although offers at various prices were made, we were unable to consumate [sic] any sales at any price higher than 18¼¢ per dozen plus packing, or 19½¢ per dozen, packed. That the only sales made by us of Carnival throw-away necklets in 1954 were made at the price of 18¼¢ per dozen, plus packing, or at 19½¢ per dozen, packed.

It is also stated that offers were made to William Shaland Corp. at 18¼ cents per dozen and that offers of the same type of merchandise were made to other prospective purchasers in the United States, including Superior and Jack M. Pulitzer & Bro.

It is further stated:

That Carnival throw-away necklets were offered and sold by Jablonex Co., Ltd. in 1954 in wholesale quantities, but that the price did not vary according to the quantity sold.

That during 1954, Carnival throw-away necklets were freely offered by Jablonex Co., Ltd. to any purchasers in the United States who desired to buy the same. That, regardless of pre-sale bargaining and negotiations, all of the sales actually made by Jablonex Co., Ltd. for export to the United States were made at the price of 18¼¢ per dozen plus packing, or at 19½¢ per dozen, packed.

Attached to a second affidavit of Mr. Bimr are copies of a letter and cable, dated May 25, 1954, addressed to William Shaland Corp., offering carnival throw-away necklets at 18¼ cents per dozen. (Plaintiff's exhibit 10.)

William Shaland stated, in an affidavit (plaintiff's exhibit 11), that, in the regular course of business, he had written to Jablonex on May 17, 1954, asking for quotations on carnival throw-away necklets. He received a letter and cable in reply, offering such necklets at 18¼ cents per dozen. He had rejected the offer and counter-offered at 15 cents per dozen, because, in his opinion, the price of 18¼ cents per dozen was higher than the price at which similar merchandise was being offered by other manufacturers and sellers in Czechoslovakia at about the same time. He was familiar with the type of throw-away necklets dealt in by appellant and stated that those offered to him by Jablonex were of the same class. He telephoned Mr. Philipson regarding the offer received from Jablonex, but Mr. Philipson said he had already placed orders for such merchandise.

Jack M. Pulitzer, a partner of Jack M. Pulitzer & Bro., testified that he had purchased 3,000 gross, carnival necklets item No. 200, from Jablonex in 1954 at 18¼ cents per dozen, plus packing, after a series of negotiations. On or about April 13, 1954, Jablonex had

written to Pulitzer stating that a sample of throw-away necklets was being mailed to him and that a pricelist was enclosed. (Plaintiff's collective exhibit 13.) The so-called pricelist is on Jablonex letterhead and is addressed to Jack M. Pullitzer [*sic*] & Bros. It states in part:

### THROW AWAY ASSORTMENT

We are sending you in sample parcel No. 124/1925 2/two/dozen throw-away-necklets which consist of pressed, cut as well as seedbead necklets, which we beg to offer you at the very favourable price of USA $0.40 per 1/one/dozen singles.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Furthermore, we have included in the same parcel 1 dozen of throw-away-necklets in pressed quality, our assortment No. 200, which we beg to offer you at the most favourable price of USA $0.19½ per one dozen singles.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

The minimum quantity of the assortment per $0.40 is 1,200 dozen, whereas of assortment No. 200 10,000 dozen singles.

Mr. Pulitzer believed that the price of 19½ cents per dozen included packing. On May 4, 1954, he wrote to Jablonex ordering 14,400 dozen or a total of 1,200 gross of No. 200 at 19½ cents per dozen and stated that he was interested in 240 gross or 1,200 dozen of the larger assortment, if the price were reduced to 35 cents per dozen. (Plaintiff's exhibit 12.) Jablonex then cabled:

RELET 4/5 ACCEPTED ASSORTMENT 200 NINETEEN AND HALF LARGE ASSORTMENT THIRTY SIX STOP TOTAL AMOUNT 3240 PLUS 246 PACKING * * *. [Plaintiff's exhibit 14.]

Mr. Pulitzer stated that his order had been on the basis of 19½ cents, including packing. Therefore, he wrote a letter on May 14, 1954, asking what the "plus 246" in the cablegram meant. (Plaintiff's exhibit 15.) On May 18, 1954, Jablonex wrote Pulitzer acknowledging receipt of a radiogram stating:

THIS CONFIRMS 1,200 GROSS NUMBER 200 AT 19½ CENTS DOZEN STOP 100 GROSS LARGE 4.32 SEND TOTAL AMOUNT INVOICE PACKING INSURANCE TO PORT L/C FOLLOWS.

The letter then suggested that two invoices be made out, one for the 19½-cent articles only, without packing, and the other for the items at 36 cents, to which packing charges for both items would be added. (Defendant's exhibit A.) Pulitzer rejected this proposal and suggested that 18½ cents be charged for the assortment No. 200 and the price of the larger necklaces be raised to 37 cents. (Defendant's exhibit B.) A letter from Jablonex, dated June 16, 1954, refers to a rectified pro-forma invoice, and states:

The only difference is that we are willing to deliver item No. 200 at the most favourable price of 18¼ cents per 1 dozen singles. We sincerely trust that you will now be able to order this item on a really large scale. Although there is a

large difference between the quantities of the cheap and more expensive necklet, we were very pleased to be able to lower the price from 19½ to 18¼ and for the sake of good order would like to mention that we shall be glad to execute this number at this quotation in future as well.   [Plaintiff's exhibit 16.]

On June 24, Pulitzer again mentioned that the value of the merchandise, plus packing, must be kept under 20 cents per dozen. (Defendant's exhibit C.)   The letter of credit, issued on that date, described the merchandise as follows:

14,400 dozen assorted throw-away necklets, assortment No. 200 packed in not more than 37 cases at $.1825 per doz., total $2,628.00.  1,200 dozen throw-away necklets, large assortment packed in four cases at $.37 per dozen, total $440.00 plus packing charges not to exceed $6.00 per case, total $246.00; plus freight and insurance to Bremen not to exceed total $200.00.   [Plaintiff's exhibit 19.]

Mr. Pulitzer stated that he placed orders for the same merchandise in September and October 1954 at 18¼ cents per dozen, plus packing. He never purchased from Jablonex at any other price.   On those occasions, he did not purchase any of the more expensive items.

Mr. Philipson testified that the initial offer made by Jablonex was rejected, because it would have resulted in a landed price of over 20 cents per dozen, at which he could not possibly have purchased and would have passed up.   He gave the following reason why a transaction at a higher price was not commercially feasible:

Because it would throw us into a completely different duty bracket, and therefore, become actually unsalable so far as we were concerned for our purpose.  We wanted a cheap item, and had to sell it under that price.

Mr. Pulitzer testified also that the purchase of this merchandise at a price amounting to more than 20 cents per dozen would not be feasible.   In a letter to Jablonex, he stated that if the total cost ran over 20 cents per dozen, he could not use these necklets at all.   (Defendant's exhibit C.)

The following facts seem clear from the record presented: In April 1954, offers of carnival necklets, assortment No. 200, were made by Jablonex to Superior and Pulitzer at 19½ cents per dozen, plus packing.   While a pricelist has been referred to, the offers were, in fact, made to particular firms individually, and there is no evidence that there was a pricelist which was generally circulated among prospective customers.   The offers were not accepted and no sales were made at this price.   After negotiations with Superior and Pulitzer, the merchandise was offered and sold to them at 18¼ cents per dozen, plus packing, and it was offered to Shaland at that price.   It is also clear, because of the type of merchandise involved, the use for which it was purchased, and the difference in duty which would result from a higher valuation, that purchases would not have been made at a price which, including packing, would have totaled more than 20 cents per dozen.

Although a minimum quantity of 10,000 dozen was mentioned in Jablonex' original offers, it was not mentioned again. In fact, the purchases made by Superior and Pulitzer were in quantities of over 10,000 dozen.

The point at issue is the market value at the time of exportation to the United States, at which such merchandise was freely offered to all purchasers, in the usual wholesale quantities in the ordinary course of trade. (Section 402(d), Tariff Act of 1930.)

The meaning of the term "market value" was discussed in *United States* v. *Alfred Kohlberg, Inc.*, 2 Cust. Ct. 849, Reap. Dec. 4526, affirmed 27 CCPA 223, C.A.D. 88, where the court stated (pp. 852–853) :

Market value has been defined as the price at which the manufacturer holds his merchandise for sale, the price at which he freely offers it in the market, and the price which he is willing to receive, and the purchasers are willing to pay, in the ordinary course of trade. See *United States* v. *Sixteen Cases of Silk Ribbons*, 27 Fed. Cases 1099. The prices in question at which the manufacturers or sellers hold their merchandise for sale and at which they freely offered it in the market were less certain discounts which were proven to be uniform in the trade. The purchasers herein, who were represented by commissionaires, were willing to pay the prices offered by the sellers, less the discounts for cash. Such prices, in our opinion, represent the dutiable value of the merchandise, and it is immaterial whether or not the discounts actually inured to the benefit of the commissionaires' principals.

In *Dalton-Cooper, Inc.* v. *United States*, 12 Cust. Ct. 456, Reap. Dec. 6007, affirmed *sub. nom. United States* v. *Dalton-Cooper, Inc.*, 14 Cust. Ct. 299, Reap. Dec. 6087, merchandise was ordered on January 27, 1942, and was shipped on February 21 of that year. It was entered at the price paid which, according to an affidavit of the exporter, was the freely offered price. However, on January 31, February 7, and March 9, offers were made for future delivery at a higher price. It was noted by the appellate division that such offers were never accepted and no sales were ever made thereunder, and the entered value was held to constitute the export value.

The situation in the instant case is somewhat the reverse. Here, there were offers before the dates of exportation at a higher price, which were not accepted. So far as appears, these offers were *bona fide*, and, were it not for subsequent developments, would establish export value. *United States* v. *American Agar & Chemical Co.*, 34 Cust. Ct. 553, A.R.D. 59, appeal dismissed 42 CCPA 244, and cases cited. However, before the present merchandise was exported, there were later offers and sales at 18¼ cents per dozen. It may be that these offers arose originally out of negotiations and bargaining by Superior and Pulitzer, but if, as we find, offers at the same price were made generally to persons interested in buying the merchandise, this price was "freely offered."

When cases have held or stated that prices arrived at by bargaining do not represent the price at which merchandise is freely offered to all purchasers in the ordinary course of trade, the merchandise was offered and sold at several different prices or there was one price at which all could buy and lower prices for those with greater bargaining ability. *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129; *United States* v. *North American Asbestos Corp.*. 48 CCPA 153, C.A.D. 783; *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846; *United States* v. *M. V. Jenkins et al.*, 24 Cust. Ct. 517, Reap. Dec. 7774, affirmed 26 Cust. Ct. 467, Reap. Dec. 7924, affirmed 39 CCPA 158, C.A.D. 479; *United States* v. *D. Hauser*, 34 Cust. Ct. 517, Reap. Dec. 8451; *United States* v. *Philipp Brothers Chemicals, Inc.*, 46 Cust. Ct. 803, A.R.D. 134. These cases do not deal with a situation where bargaining causes a seller to abandon an old freely offered price and offer a new one to all interested purchasers.

In the *Mexican Products* case, there was a pricelist with net prices, but varying discounts were given to individual purchasers in accordance with their bargaining ability. It clearly appeared that the merchandise was not offered to *all* purchasers at less than the list prices, and the list prices were held to represent dutiable value. In the *Aceto Chemical* case, there were sales at a variety of prices making it impossible to determine from them *an* American selling price. The court, therefore, found value on the basis of the list price at which the merchandise was offered to all purchasers and at which most sales were actually made.

In the instant case, the facts of record demonstrate that the purchasers were unwilling to pay more than 18¼ cents per dozen, plus packing, or 19½ cents per dozen, packed, for the merchandise, and the seller, having tried unsuccessfully to obtain more, was willing to receive that amount. If he had not sold at that price, there would have been no "ordinary course of trade"; in fact, there would have been no trade at all. The fact that the price of 18¼ cents per dozen was not arrived at until extensive negotiations with the prospective purchasers had been conducted does not negate its use in finding export value, provided it otherwise meets the statutory conditions.

It is well settled that where prices do not vary according to the quantity purchased, no question of the statutory element of "usual wholesale quantities" is involved. *United States* v. *Antique Import Co.*, 40 Cust. Ct. 868, A.R.D. 83; *United States* v. *American Express Co.*, 44 Cust. Ct. 779, A.R.D. 120; see *Jenkins Brothers* v. *United States*, 25 CCPA 90, 96, T.D. 49093. As has been stated, in the instant case, the initial offers were for a minimum quantity of 10,000 dozen, but no quantity was mentioned in connection with the later offers, and Mr. Bimr stated, in his affidavit, that the price did not vary with

the quantity. Such a statement has been held to be a fact and not a conclusion, which a qualified witness, such as Mr. Bimr, is competent to state. *Luria Steel & Trading Corp. et al.* v. *United States*, 42 Cust. Ct. 480, Reap. Dec. 9311; *United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125; *Haddad & Sons, Inc.* v. *United States*, 53 Cust. Ct. 428, Reap. Dec. 10830.

The trial judge rejected the sale to Pulitzer as evidence of the freely offered price of this merchandise on the ground that it was a tie-in sale. It appears that, in the course of negotiations, there was a suggestion that the cost of packing assortment No. 200 be added to the price of another item, so that the price of the No. 200 assortment would total less than 20 cents per dozen. However, this proposal was not accepted and Jablonex' final offer of June 16, 1954 (plaintiff's exhibit 16), states, "we are willing to deliver item No. 200 at the most favourable price of 18¼ cents per 1 dozen singles," and, as a partial offset to this concession, Pulitzer paid 37 cents a dozen for a larger bead necklet, not involved in the reappraisement, an increase over 36 cents previously contemplated in their negotiations. This is the so-called tie-in sale. Of course, the learned trial judge was rightly concerned about allowing a sham or pretended transaction to be put before the court as reality. However, the fact that one transaction is linked with another and one makes the other acceptable to the parties, does not necessarily make either a sham. All the evidence establishes that the purported 37-cent price paid for the larger necklet was *not* really, in part, payment for the merchandise such as that involved in the reappraisement: (1) Pulitzer afterwards bought other shipments of the latter type at 18¼ cents, without buying any more of the larger necklet, (2) the added price paid for the larger necklet, in the instant transaction, did not nearly equalize the concession made by Jablonex in the price it demanded for the merchandise like that under appraisement, (3) others were sold or offered the 18¼-cent price without any such tie-in being required, (4) there is no showing 37 cents did not better than 36 cents reflect the fair value of the larger necklet. (A big increase might be *res ipsa loquitur*, telling its own story, but this is a little one.) Suppose there was a tie-in, we cannot disregard the sale as supporting the 18¼-cent value, unless we conclude that a higher price was really paid, partly in the guise of the 37-cent price. This we cannot do on the evidence taken. If the trial judge's analysis of the alleged tie-in fails, so does her conclusion that Jablonex did not make the 18¼-cent price available to "all purchasers." This is really the crucial point in the case.

Mr. Bimr states, in his affidavit, that this type of merchandise was not available in an unlimited quantity since it was made up of surplus and wrongly manufactured goods. The number of prospective

customers was probably also limited. No evidence has been presented to show that Jablonex circulated a pricelist or made offers to more than a few customers, but apparently these were all who were known to Jablonex, who might be interested. Neither does it appear that it would have refused to sell to any purchaser. In fact, in the case of Pulitzer and Shaland, the offers seem to have followed inquiries made by the prospective purchasers. (R. 49; plaintiff's exhibit 11.) The term "all purchasers" is not without limitation but is qualified by the phrase "in the ordinary course of trade." *United States* v. *Nelson Bead Co.*, 42 CCPA 175, C.A.D. 590. It means all who are within the class of customers to whom the merchandise is useful. *Rico, Inc.* v. *United States*, 48 CCPA 110, C.A.D. 773; *Sani-Smoke, Inc.* v. *United States*, 50 CCPA 82, C.A.D. 825. In view of the type of merchandise here and its limited use, the record presented establishes that no one was knowingly excluded and it was freely offered to all who were likely to purchase it.

We conclude that the record presented is sufficient to establish that, at the dates of exportation, these carnival necklets were freely offered for sale for exportation to the United States to all who cared to buy in wholesale quantities, in the ordinary course of trade for such merchandise, at 18¼ cents per dozen, plus packing, and that the price did not vary with the quantity.

We find as matters of fact:

1. That the merchandise involved herein consists of so-called carnival necklets, assortment No. 200, manufactured in Czechoslovakia by Jablonex Czechoslovak Export Co., Ltd., and exported from Czechoslovakia on July 17, July 22, and September 29, 1954.

2. That the said carnival necklets consisted of irregular goods produced out of surplus and wrongly manufactured beads, strung together, with assorted types of clasps or catches, used for carnival throw-away purposes only.

3. That said merchandise was invoiced and entered at 18¼ cents per dozen, plus packing, and was appraised at 19½ cents per dozen, plus packing.

4. That, at the time of exportation involved herein, such merchandise was not freely offered for sale to all purchasers for home consumption in Czechoslovakia.

5. That, at the time of exportation involved herein, such merchandise was freely offered for sale to all purchasers for exportation to the United States.

6. That, at a time before the dates of exportation involved herein, such merchandise was offered by Jablonex to purchasers in the United States at 19½ cents per dozen, plus packing, but no sales were made at that price.

7. That, because of the type of merchandise involved, the use for which it was purchased, and the difference in duty which would result from a higher valuation, prospective customers were unwilling to purchase at a price which, including packing, would have totaled more than 20 cents per dozen.

8. That, at the dates of exportation involved herein, such merchandise was freely offered for sale and sold for exportation to the United States to all who cared to buy in wholesale quantities, in the ordinary course of trade, at 18¼ cents per dozen, plus packing; that the price did not vary with the quantity.

We conclude as matters of law:

1. That export value, as that value is defined in section 402(d) of the Tariff Act of 1930, is the proper basis for valuation for the carnival necklets, assortment No. 200, involved herein.

2. That there was no foreign value for such merchandise, which was not freely offered for sale for home consumption in the country of exportation.

3. That the export value is 18¼ cents per dozen, plus packing.

The decision and judgment below are reversed. Judgment will be rendered accordingly.