(R.D. 11454)

F. W. MYERS & Co., INC. v. UNITED STATES

Entry No. 42009, etc.

(Decided January 8, 1968)

Barnes, Richardson & Colburn (Joseph Schwartz of counsel) for the plaintiff.
Edwin L. Weisl, Jr., Assistant Attorney General (Bernard J. Babb and Glenn E. Harris, trial attorneys), for the defendant.

LANDIS, Judge: This is another reappraisement case in what appears to be a growing dispute as to the valuation of merchandise under the new valuation law, section 402 of the Tariff Act of 1930, as

amended by the Customs Simplification Act of 1956, T.D. 54165, 19 U.S.C., section 1401a, in export transactions with overtones of parent-subsidiary company relationships.

The merchandise of this appeal for reappraisement is 18-gauge, flash-in grade, steel tubing in two sizes, one measuring 1⅞ inches, the other 2 inches in diameter, manufactured by International Formed Tubes, Ltd. (hereinafter International Tubes), Scarboro, Ontario, Canada, and sold to International Stamping Co., Inc. (hereinafter International Stamping), Hartford, Wisconsin. Both companies are wholly owned subsidiaries of Midas International Corporation, Chicago (hereinafter Midas Corp.).

Fourteen shipments, exported from Canada between April 30, 1964, and February 11, 1965, are covered by this appeal, each entered at Detroit, Michigan, by F. W. Myers & Co., Inc., customhouse broker and nominal plaintiff herein. The appraiser at Detroit valued the steel tubes on basis of export value, section 402(b), as amended, T.D. 54165, 19 U.S.C., section 1401a; the 1⅞ inch at $11.22 per 100 feet; the 2 inch at $13.38 per 100 feet, Canadian currency.

Plaintiff's rule 15 statement claims that the steel tubes should be reappraised on basis of amended section 402(b) export value or amended section 402(d) constructed value, on either basis, at the invoice and entered values, namely, $8.06 per 100 feet for the 1⅞ inch and $8.49 per 100 feet for the 2-inch size tubes, United States dollars. In its brief, filed with the court, plaintiff has abandoned the claim for reappraisement under section 402(d), constructed value. That claim is, therefore, dismissed and I find and hold that export value, under section 402(b), as amended, is the proper basis for appraisement of these tubes.

There is considerable testimony and documentary evidence in the record on the cost of producing the steel tubes. Defendant concedes that plaintiff's claimed export values are enough to cover the manufacturer's cost of producing the steel tubes and make a profit. (Defendant's brief, page 18.) The value basis proper for these tubes, as I have already found, is export value. Absent any question that the allocation of fixed costs of production to sales in Canada and export sales to the United States affected the price for export as in *John V. Carr & Son, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860, I shall review only that much of the record as is probative of the amount of export value proper for the steel tube sizes in question.

Export value and the terms therein are, in pertinent part, defined in section 402, as amended, as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraise-

ment, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales offered—

    (A) to all purchasers at wholesale or

    (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, and (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

On trial, plaintiff called Mr. Henry F. Petton, the customs examiner of the steel tubes at Detroit, Mr. Jacobus D. Wesseling, controller of International Tubes, the manufacturer and seller of the imported merchandise, and Mr. Robert T. Schroeder, vice president of Midas Corp. The following facts come through in their testimony:

The appraised values, as advisorily fixed by Mr. Petton and approved by the appraiser, are the prices for home consumption and export to the United States of similar merchandise recited in the pricelists of Standard Tube and T.I., Ltd., another Canadian manufacturer of steel tubes.

International Tubes, the wholly owned subsidiary of Midas Corp., manufactures steel tubes exclusively for use in fabricating automotive exhaust and tailpipes. It does not sell or offer to sell steel tubes for home consumption in Canada but fabricates about 50 percent of the tubes it produces into exhaust and tailpipes. The remaining 50 percent, it sells for export to the United States solely to International Stamping and Muffler Corporation of America, Chicago, Illinois (hereinafter Muffler Corp.), the latter also a wholly owned subsidiary of Midas Corp. International Stamping and Muffler Corp., in turn, fabricate the steel tubes into exhaust and tailpipes.

Mr. Wesseling for International Tubes, Mr. Schroeder for Midas Corp., and a Mr. Lawrence Zalusky (controller of Midas Corp.) conferred and negotiated in September 1963 on the selling price of these steel tubes as and between International Tubes, International

Stamping, and Muffler Corp. They kept in mind the Midas Corp. "point of view" that the plants should operate on a profitable basis; that the export price should be competitive with the prices of tubes produced in the United States and that International Tubes needed the business. A pricelist (exhibit 1) was drawn up, effective October 1, 1963, reciting unit prices (the same as the invoice unit prices here) which included the cost of all containers and coverings of whatever nature and all expenses incidental to placing the steel tubes of the sizes here in condition packed ready for shipment to the United States, f.o.b. Scarboro, Ontario. Between January 1, 1964, and February 10, 1965, International Stamping and Muffler Corp. bought substantial quantities of steel tubes (exhibits 2 and 3) for further processing into exhaust and tailpipes.

Five or six Canadian firms manufacture steel tubes in competition with International Tubes, but none of the firms had export sales.

Steel tubes, like those here imported, are also manufactured in the United States where they are sold at a delivered price "slightly less than the delivered price of the tubing manufactured in Canada" (R. 84), but not enough to materially distort the profits of International Stamping and Muffler Corp. in their manufacturing operations. In April 1964 and June 1964, the same relative period as these importations, International Stamping bought 18-gauge 1⅞-inch and 2-inch steel tubes from the Green Bay Steel Corp., Green Bay, Wisconsin, at $9.95 per 100 feet and $10.20 per 100 feet, respectively, delivered to Hartford, Wisconsin. (Exhibit 16.) Mr. Schroeder calculated that International Tubes delivered price of Canadian steel tubes would be about $10.23 per 100 feet for 1⅞ inch and $10.78 per 100 feet for the 2 inch.

The steel tubes of this litigation are what is known as "flash-in grade" meaning that the flash raised by the electric weld used in producing the tubes is removed from the outside but not from the inside of the tube.

Defendant's exhibit A is an affidavit on the letterhead of Standard Tube and T. I., Ltd. (hereinafter Standard Tube), Woodstock, Ontario, subscribed and sworn to by William Watson, general sales manager of the firm. The affidavit substantially recites that Standard Tube manufactures 18-gauge electric welded steel tubes 1⅞ and 2 inches in diameter, identical to that manufactured by International Tubes, Scarboro, Ontario, Canada, for home consumption and for export, at prices per 100 feet in two grades, one with the inside flashing removed and one with the inside flashing not removed; that notwithstanding the sales records of Standard Tube for the period May 1, 1964, through February 28, 1965, show only one actual sale of 1⅞ inch or 2 inch 18-gauge steel tubing, *flash removed grade*, for export

to the United States, Standard Tube freely offered to sell flash-in grade tubes in those sizes to all known potential customers for home consumption or for export at general list prices, and to customers buying tubes for use in the automotive industry at lower commodity list prices, "which were necessary to compete with other companies, particularly United States manufacturers, which sell fabricated tubes to the automotive industry," the steel tubing listed in the general pricelist and the commodity pricelist being otherwise identical.

The general pricelist of Standard Tube, attached to exhibit A, lists 1⅞ inch, 18-gauge steel tube, flash-in grade, at $11.22 per 100 feet, and 2 inch, 18 gauge, flash-in grade, at $13.38 per 100 feet (both Canadian currency and both equal to the contested appraised values). The commodity pricelist, also attached to exhibit A, lists 1⅞ inch, 18-gauge steel tube at $10.66 per 100 feet and 2 inch, 18 gauge, at $12.71 per 100 feet (both prices in Canadian currency and both, as I read Mr. Watson's affidavit, for flash-in grade tubes). International Tubes is listed as one of the customers qualified to buy at the commodity list prices. (Defendant recites that Standard Tube commodity list prices, $10.66 and $12.71, Canadian currency, amount to $9.86 and $11.76, United States currency, at the certified rate of exchange for the second quarter of 1964, defendant's brief, page 11.)

Both sides agree that the above facts raise what is a rather gritty issue in reappraisement litigation, namely, whether the invoice prices of International Tubes fairly reflect the market value of the steel tubes sold to its selected purchaser, International Stamping.

Plaintiff fits the facts to section 402(b) and the relevant definitions in section 402(f) to contend that the invoice prices fairly reflect the market value because, as negotiated, the invoice prices were more than enough to cover the costs of producing the steel tubes, make a profit, and still remain competitive with the prices of steel tubes manufactured and sold to the United States. Defendant's basic contention is that plaintiff has not overcome the presumption of correctness attached to the appraisement. 28 U.S.C., section 2633. Defendant builds on this point with argument that plaintiff's proofs offer no "meaningful yardstick" by which to measure prices which fairly reflect the market value. As defendant reads *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841, a yardstick is necessary and its measure lies in proofs for the court to weigh and assess the differences between two sets of prices and the reasons for those differences. A price which fairly reflects the market value of merchandise being the general concept that it is, I agree with defendant that, faced with a price, some "yardstick" (if one wants to call it that) is necessary to a determination that it does or does not fairly reflect market value. To say this, however, is not to say that the concept of a price that fairly reflects

the market value is subject to proofs that will be constant and the same in each and every case.

Weighing the facts in this record, I am of the opinion that plaintiff has proved a *prima facie* case for the claimed export value and, in so doing, has overcome the presumption that the appraised export values, based on prices at which identical or similar steel tubes were *freely offered* for export in Canada, are correct.

Defendant hits hard at what it considers plaintiff's failure to offer any proof explaining the differences between the invoice prices, selling prices in Canada, and offered prices for export in Canada, for steel tubes identical or similar to those in this case. What defendant seems to want is some sort of mathematical breakdown that will explain the differences. But a mathematical breakdown need not always be necessary. Differences in prices, especially offered prices for export as against actual sales for export, may be as well explained by what takes place in the market place as by mathematical breakdown if, indeed, such a breakdown is possible. For "the market value is not merely the intrinsic value of the merchandise, but rather, is the price which a product is able to command in the market." *Chr. Bjelland & Co., Inc.* v. *United States*, 52 CCPA 38, 43, C.A.D. 855, see also, decision in *John V. Carr & Sons, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860 (dissenting opinions). As Chief Judge Rao said in his opinion reviewing the decision of the trial judge in *Acme Steel Company* v. *United States*, 48 Cust. Ct. 497, Reap. Dec. 10135:

* * * in the phrase "which fairly reflects the market value of the merchandise," the key expression is market value, and * * * the following quotation from the case of *United States* v. *Alfred Kohlberg*, 2 Cust. Ct. 849, Reap. Dec. 4526, affirmed, *Same* v. *Same*, 27 CCPA 223, C.A.D. 88, is an acceptable definition thereof:

> Market value has been defined as the price at which the manufacturer holds his merchandise for sale, the price at which he freely offers it in the market, and the price which he is willing to receive, and the purchasers are willing to pay, in the ordinary course of trade. See *United States* v. *Sixteen Cases of Silk Ribbons*, 27 Fed. Cases 1099 * * *. [*United States* v. *Acme Steel Company*, 50 Cust. Ct. 529, 536, A.R.D. 152.]

This, I take it, is why our court of appeals said:

* * * all *sales* in the ordinary course of trade are proper for consideration in ascertaining the price which fairly reflects the market value of the merchandise and that evidence of price, and hence of the value of the goods in the foreign market, is relevant to the ultimate determination of the export value of imported merchandise within the ambit of section 402(b) of the Tariff Act of 1930, as amended, *supra*, in the case of sales to selected purchasers. [Emphasis added. *United States* v. *Acme Steel Company*, 51 CCPA 81, 89, C.A.D. 841.]

The sales that occurred in the market place are significant in this record. The only competing Canadian manufacturer of steel tubes we know anything about, aside from International Tubes, manufacturer of the imported steel tubes, is Standard Tube. In the ordinary course of trade, Standard Tube freely offered its steel tubes for home consumption in Canada and for export to the United States at two price levels, one, a so-called general pricelist to all, the other, a so-called commodity pricelist to those using steel tubes in the automotive trade. The offerings at the published prices, brought sales for home consumption to Canada but, during the period of these importations, not one export sale of flash-in grade steel tubes was realized from the offers. (I discount the one sale of flash removed grade steel tubes in the relevant export period as not identical or similar merchandise.) And this, notwithstanding the commodity list prices were lower "to compete with other companies particularly United States manufacturers, which sell fabricated tubes to the automotive industry." (Defendant's exhibit A.) International Tubes, on the other hand, did not offer or sell its flash-in grade steel tubes in Canada at all, but sold exclusively for export to the United States to two *selected* purchasers in the automotive trade. Selling for export to the United States, International Tubes also had "to compete with other companies particularly United States manufacturers, which sell fabricated tubes to the automotive industry." The invoice prices at which it sold, f.o.b. Scarboro, Canada, were on this record, competitive with United States delivered prices for identical or similar steel tubes made in the United States. Actual sales, where merchandise is freely sold, are the measure of export value under section 402(b). *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846; *Haddad & Sons, Inc.* v. *United States*, 56 Cust. Ct. 792, A.R.D. 205; *W. J. Byrnes & Company* v. *United States*, 50 Cust. Ct. 406, Reap. Dec. 10451, dismissed on review, *United States* v. *W. J. Byrnes & Company*, 50 Cust. Ct. 574, A.R.D. 158; *Henry Picard, Jr.* v. *United States*, 57 Cust. Ct. 689, R.D. 11242. Under section 402(f), proofs include sales to all purchasers at wholesale or in the ordinary course of trade to one or more selected purchasers at a price which fairly reflects the market value of the merchandise. The buyer in this case was a selected purchaser.

I am of the opinion that the actual export sales prices in Canada are more probative of an export value, at a price that fairly reflects market value, than the offered prices for export in Canada at which there were no sales, even as section 402(f) provides. I do not discuss the possibility that the commodity list prices in Canada to the automotive industry might reflect the fair market value since there is no evidence of export sales at those prices. It is not necessary that "the price at which such merchandise is freely sold in the foreign market

* * * be the same as the price at which it was offered for exportation to the United States, for export value to exist." *United States* v. *Acme Steel Company*, 50 Cust. Ct. 529, 536, A.R.D. 152.

Defendant's argument, citing cases, that value under section 402 is the price to all purchasers at wholesale buying for industrial use or for resale otherwise than at retail, is a throwback to the cases holding that, under the old valuation statute, the value of merchandise was the price at which all purchasers could buy and not the price to those of a particular class. Substantially the same argument was rejected in *W. J. Byrnes & Company* v. *United States*, 50 Cust. Ct. 406, Reap. Dec. 10451, review dismissed, *United States v. W. J. Byrnes & Company*, 50 Cust. Ct. 574, A.R.D. 158. It is a contradiction to say that, under new section 402, the value of merchandise is the price to all purchasers at wholesale buying for industrial use or for resale otherwise than at retail, when:

In contradistinction to the approach obtaining under prior statutes, the new statutory definitions of the phrase "freely sold or * * * offered for sale" authorize consideration of sales to "one or more selected purchasers at wholesale" in the determination of value provided such sales are made in the "ordinary course of trade" at a price which fairly reflects market value and without restrictions as to disposition or use of the merchandise by the purchaser. The record is abundantly clear that the instant sales to Acme Chicago, the parent company, were not circumscribed by any restrictions as to use or disposition of the merchandise. The statute expressly authorizes sales to a selected purchaser. Contrary to the contention advanced by appellant, the fact of the parent and subsidiary relationship existing between the exporter and the importer does not of itself preclude consideration of whether or not there was an export value for the instant merchandise, nor does the fact that the importer was the sole purchaser of the merchandise prima facie affect the question of export value. To hold otherwise would necessitate reading into the statute by construction a limitation unwarranted by the plain language of the pertinent provisions of the statute. [*United States* v. *Acme Steel Company*, 51 CCPA at pages 87, 88.]

On trial, evidence of sales of steel tubing manufactured and sold in the United States was received over defendant's objection. Defendant asks that that evidence now be stricken or held not probative of a price which fairly reflects market value, citing, *John V. Carr & Son, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860. The *Carr* case involved facts substantially different from the facts here. It does not require nor, in my opinion, is it a precedent for a hard and fast rule that evidence of United States prices is, in every case, inadmissible or irrelevant. The record shall stand as made.

I find as facts:

1. That the merchandise of this appeal to reappraisement consists of 18-gauge steel tubes, flash-in grade, $1\frac{7}{8}$ inches and 2 inches in

diameter, manufactured by International Formed Tubes, Ltd., Scarboro, Ontario, Canada, and exported between April 30, 1964, and February 11, 1965.

2. That steel tubes are not specified in the final list of articles published by the Secretary of the Treasury pursuant to the Customs Simplification Act of 1956.

3. That, at the respective times of exportation, International Formed Tubes, Ltd., did not sell or offer to sell steel tubes identical in physical characteristics with the steel tubes of this appeal for home consumption in Canada.

4. That, at the respective times of exportation, Standard Tube and T. I., Ltd., Woodstock, Ontario, Canada, freely sold for home consumption in Canada and freely offered to sell for export to the United States, in the ordinary course of trade, steel tubes identical in physical characteristics with the 1⅞- and 2-inch steel tubes of this appeal to all purchasers, at general list prices, and to purchasers for use in the automotive industry, at commodity list prices, and that there were no export sales at the offered prices.

5. That, at the respective times of exportation, and in the ordinary course of trade, International Formed Tubes, Ltd., freely sold steel tubes identical in physical characteristics with the 1⅞-inch and 2-inch steel tubes of this appeal, for export to the United States to two selected purchasers, International Stamping Company, Hartford, Wisconsin, and Muffler Corporation of America, Chicago, Illinois, at $8.06 and $8.49 per 100 feet, United States dollars, respectively, which prices did not substantially affect the value of the merchandise to usual purchasers at wholesale.

6. That International Formed Tubes, Ltd., International Stamping Company, and Muffler Corporation of America are all wholly owned subsidiaries of Midas International Corporation, Chicago, Illinois, and that Midas International Corporation negotiated the prices recited in finding 5 with International Formed Tubes, Ltd.

7. That the prices, recited in finding 5, included the cost of all containers, coverings, and expenses necessary to put the steel tubes in condition packed ready for shipment, f.o.b. Scarboro, Ontario, Canada, and that said prices were sufficient to cover the cost of producing the steel tubes and make a profit.

I conclude as a matter of law:

1. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for appraisement of the steel tubes of this appeal.

2. That the export value of the steel tubes of this appeal is not the offered prices for export of steel tubes identical or similar in physical characteristics with the steel tubes undergoing appraisement produced

by another person in Canada, but the price at which the steel tubes of this appeal were freely sold to all purchasers or to one or more selected purchasers at a price which fairly reflects their market value.

3. That the steel tubes of this appeal were freely sold for export to International Stamping Company, a selected purchaser, at the prices recited in finding 5 and that those prices fairly reflect market value.

4. That the export value of the steel tubes of this appeal, as defined in section 402(b) of the Tariff Act of 1930, as amended, is $8.06 per 100 feet, net packed, for the 1⅞-inch diameter steel tubing and $8.49 per 100 feet, net packed, for the 2-inch diameter steel tubing, United States dollars.

Judgment will be entered accordingly.