**UNITED STATES**

v.

**F. W. MYERS & CO., Inc.**

**A.R.D. 264; Reappraisement R65/10220.**

United States Customs Court,
First Division, Appellate Term.

Dec. 11, 1969.

William D. Ruckelshaus, Asst. Atty. Gen. (Glenn E. Harris, New York City, trial atty.), for appellant.

Barnes, Richardson & Colburn, New York City (Joseph Schwartz, New York City, of counsel), for appellee.

Before WATSON, MALETZ and RE, Judges.

MALETZ, Judge:

This application for review involves 14 shipments of 18-gauge steel tubing, 1⅞″ and 2″ in diameter, exported from Canada, via Detroit, between April 30, 1964 and February 11, 1965. The manufacturer-exporter of the tubing was International Formed Tubes, Ltd. of Scarboro, Ontario (International Tubes), and the consignee—a selected purchaser—was International Stamping Co., Inc. of Hartford, Wisconsin (International Stamping). Both companies are wholly owned subsidiaries of Midas International Corporation of Chicago (Midas).

The invoiced selling price of the 1⅞″ tubing was $8.06 per 100 feet (U.S.

funds), and the invoiced selling price of the 2″ size was $8.49 per 100 feet (U.S. funds). There is no dispute that the proper statutory basis of appraisement is export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. § 1401a(b)). The government appraiser at Detroit appraised the 1⅞″ tubing at $11.22 per 100 feet (Canadian funds) and the 2″ tubing at $13.38 per 100 feet (Canadian funds). These appraisals were based on the general price list of another Canadian manufacturer of steel tubing—Standard Tube and T.I., Ltd. of Woodstock, Ontario (Standard Tube). Standard Tube's general price list covered sales of steel tubing in the Canadian market for home consumption and for export to the United States. However, during the period in issue, Standard Tube made no sales for export to the United States under its general price list. Further, during the period involved, Standard Tube made only one actual sale of 1⅞″ or 2″ tubing for export to the United States. That sale was at $13.46 per 100 feet (Canadian funds) for the 1⅞″ size and $17.54 per 100 feet (Canadian funds) for the 2″ size, all less 5 percent. The government appraiser did not use this single isolated sale as a basis of appraisement but rather used the prices set out in Standard's general price list.

Against this background, appellee (plaintiff below)—the customs broker who made the entries at Detroit—contended before the trial judge that the actual sale price of the steel tubing—i. e., $8.06 and $8.49 (U.S. funds) for the smaller and larger sizes, respectively—represented statutory export value on the asserted ground that it was a price which fairly reflected market value. Appellant (defendant below) argued to the contrary that export value could be found for the imported merchandise only on the basis of identical or similar merchandise manufactured by another company in the country of exportation, viz. Standard Tube. The trial judge sustained appellee's contention holding that the "actual export sales prices in Canada are more probative of an export value, at a price that fairly reflects market value, than the offered prices for export in Canada at which there were no sales * * *." F. W. Myers & Co., Inc. v. United States, 60 Cust.Ct. 716, 722, R.D. 11454 (1968).

Appellant insists that the decision below is erroneous. It argues that appellee failed to sustain its burden of proof in not having accounted for the difference between International Tubes' invoice prices to International Stamping and the prices at which identical or similar merchandise was sold or offered for sale in Canada by other manufacturers. It contends, also, that the court below erred in refusing to strike certain evidence, admitted over appellant's objections, concerning purchases of steel tubing in the United States market. Finally, appellant maintains that International Tubes' selling prices to its corporate affiliates in the United States do not form a proper basis for dutiable value under section 402 since, it says, dutiable value under that section is the price to all wholesalers buying for industrial use or for resale otherwise than at retail.

At the outset, we quote the pertinent provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

* * * * * *

(f) *Definitions.*—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

* * * * * *

There is no real dispute as to the facts. The Canadian exporter, International Tubes, the wholly owned subsidiary of Midas, is in the business of manufacturing steel tubing and automotive exhaust system parts. It does not sell or offer to sell steel tubing for home consumption in Canada. Instead, it fabricates about 50 percent of the tubing it produces into automotive exhaust pipes and tail pipes. The remaining 50 percent it sells for export to the United States, but only to its corporate affiliates, International Stamping and the Muffler Corporation of America, Chicago, Illinois (Muffler Corp.)—the latter being also a wholly owned subsidiary of Midas. International Stamping and the Muffler Corp., in turn, fabricate the steel tubes into automotive exhaust and tail pipes.

In producing the steel tubing, a burr known as "flashing" is caused by the electric welds, with the amount of flash not exceeding a few thousandths of an inch. During the manufacturing process, International Tubes removed the outside flash. The inside flash was not removed, however, since the exhaust pipe and the tail pipe into which the tubing was fabricated were both used to pass through fumes and for this purpose a rough interior was deemed satisfactory.

International Tubes' selling prices to its affiliates, International Stamping and Muffler Corp., were arrived at by

negotiations in September 1963 between the controller of International Tubes and two officers of Midas—i. e., its vice-president in charge of manufacturing and its controller. These negotiations resulted in a price list dated October 1, 1963, which was confined to the two companies (International Stamping and Muffler Corp.) as the tubing was not offered or sold to anyone else. Further, Midas' vice-president agreed on behalf of International Stamping and Muffler Corp. to buy the tubing at the prices specified in that price list.

In the negotiations leading to the price list, the primary interest of Midas' vice-president was to see to it that its manufacturing plants operated on a profitable basis. For that reason, in negotiating the purchase of tubing from the Canadian company—International Tubes—, he wanted to be assured that the tubing would "lay into" Midas' plants at approximately the same price that Midas could buy it for in the United States. On this aspect, the evidence shows that steel tubing, like that here imported, was also manufactured in the United States where it was sold at delivered prices slightly less than the delivered price of the tubing manufactured in Canada, but not enough less to materially distort the profits of International Stamping and Muffler Corp. in their manufacturing operations. To illustrate, in April 1964 and June 1964, International Stamping bought 18-gauge $1\frac{7}{8}''$ and $2''$ steel tubes from the Green Bay Steel Corp., Green Bay, Wisconsin, at $9.95 per 100 feet and $10.20 per 100 feet, respectively, delivered to Hartford, Wisconsin. By comparison International Tubes' delivered price to Hartford, Wisconsin, would amount to $10.23 per 100 feet for the $1\frac{7}{8}''$ tubing and $10.78 per 100 feet for the $2''$ tubing. Withal, Midas' vice-president agreed to International Tubes' October 1, 1963 list of prices (i) because it "would not put us out of line competitively with the

factories in the United States"; and (ii) in view of the fact that "the Canadian operation is a wholly-owned subsidiary, we * * * would naturally prefer to give them the business."

The prices set out in International Tubes' October 1, 1963 price list were f. o. b. Scarboro, Ontario; were in United States funds; and did not depend on the quantities purchased. Sales were made thereafter at those prices to International Stamping and Muffler Corp.[1] The selling prices included the cost of all containers and coverings of whatever nature (steel strapping), and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States, and the sales were made without restrictions as to the disposition or use of the merchandise by the purchaser. During the period involved, the operations of International Tubes were normal; there were no strikes or lockouts, no shortages of mufflers nor any oversupplies. Also, International Stamping and Muffler Corp. bought the merchandise for industrial use and not for resale.

Additionally, International Tubes' prices to International Stamping and Muffler Corp. covered all costs of production of whatever kind (including costs of material, costs of labor, costs of factory overhead, shipping costs, general and administrative expenses, and interest expense), together with a profit of 6.92 percent of cost for the $1\frac{7}{8}''$ tubing and 6.77 percent for the $2''$ tubing.

Turning now to Standard Tube of Canada, an affidavit by its general sales manager establishes the following: Standard Tube manufactures, for home consumption and for export, steel tubing $1\frac{7}{8}''$ and $2''$ in diameter which is identical to that produced by International Tubes. The tubing thus manufactured by Standard Tube is used, among other things, in automotive exhaust and tail pipes, and comes in two grades, one

[1]. For the period from January 1964 to February 1965, such sales by International Tubes to International Stamping aggregated 698,880 feet, while sales by International Tubes to Muffler Corp. totaled 2,194,535 feet.

with the inside flashing removed and one with the inside flashing not removed. There is a premium for the flash-removed grade of 5 percent on the base price of the flash-in grade.

During the period from May 1, 1964 through February 1965, Standard Tube issued two price lists. One, a so-called "general price list," was distributed (1) by mail and/or personally to all companies in Canada whom Standard knew to be potential buyers for home consumption and/or export; and (2) to anyone who made a request for the price list. The other, a so-called "commodity price list,"—covering identical tubing—was distributed by mail and/or personally to potential customers buying steel tubing for use in the automobile industry. The commodity price list "reflect[ed] lower prices which were necessary to compete with other companies, particularly United States manufacturers, which sell fabricated tubes to the automotive industry." Except for a special 5 percent discount to "approximately five recognized * * * jobbers," all sales of 18-gauge 1⅞" and 2" weld steel tubing by Standard Tube for Canadian consumption during the period were at the prices specified on one of the two price lists—i. e., the general price list or the commodity price list.

Examination of the general price list discloses that Standard offered to sell 1⅞" and 2" 18-gauge steel tubing, flash-in grade, at $11.22 and $13.38 (both Canadian funds) per 100 feet, respectively. These amounts (as we have seen) are identical to the appraised values determined by the government appraiser.

It is to be noted, in addition, that during the period from May 1, 1964 through February 26, 1965, Standard Tube made only one actual sale of 1⅞" or 2" 18-gauge steel, flash-removed grade, for export to the United States.

The sales price, however, was not that specified in the general price list. Rather, the sale was effected at a price of $13.46 per 100 feet (Canadian funds) for the 1⅞" size and $17.54 per 100 feet (Canadian funds) for the 2" size, all less 5 percent discount.[2]

We turn now to the legal principles involved. The first requirement in the definition of export value is that it shall be the price "at which such or similar merchandise is freely sold * * *." The phrase "such or similar merchandise," as defined in section 402(f) (4) (A), means *in the first instance*:

The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

Thus, if International Tubes' selling price to International Stamping represents export value, the tubing manufactured by other manufacturers may not be considered. Chr. Bjelland & Co., Inc. v. United States, 48 Cust.Ct. 593, 598, R.D. 10213 (1962).[3]

The phrase "freely sold" is likewise defined in section 402(f) (1) as sales or offers (A) to all purchasers at wholesale, or (B) in the ordinary course of trade to selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, without restrictions, etc. The record establishes that International Tubes sold the tubing only to two United States purchasers, International Stamping and Muffler Corp., at the same prices. Therefore category (B), referring to selected purchasers at wholesale, is applicable. Further, since the two United States companies purchased the tubing for industrial use, they were "purchasers at wholesale" within the meaning of section 402(f) (3).

2. This sale was for a total of 10,600 feet.

3. Affirmed in Chr. Bjelland & Co., Inc. v. United States, 51 Cust.Ct. 520, A.R.D.

161 (1963), affirmed in Chr. Bjelland & Co., Inc. v. United States, 52 CCPA 38, C.A.D. 855 (1965).

 The record establishes also that the export sales of steel tubing to the United States during the period in question were made under normal business conditions. This meets the requirements of section 402(f) (1) (B) as to "ordinary course of trade."

The next requirement of section 402(f) (1) (B) is that the price fairly reflect the market value of the merchandise "without restrictions as to the disposition or use of the merchandise by the purchaser." The record shows that no restrictions were imposed on the importers of the merchandise in question.

A further requirement of "export value" is that it shall be the price "in the principal markets of the country of exportation." As to this, the record shows that all sales for exportation to the United States of "such" merchandise were f. o. b., Scarboro, the exporter's home situs. Hence there is no issue as to principal market for "such" merchandise.

"Export value" in section 402(b) shall be the price "in the usual wholesale quantities." Here again, the evidence shows that the prices of "such" merchandise did not vary by reason of the quantities sold. Under these circumstances, there is no issue of usual wholesale quantity.

This brings us to the issue which is at the crux of the case—whether the export selling price of "such" merchandise, i. e., the steel tubing manufactured by International Tubes, "fairly reflects the market value" of such merchandise within the meaning of section 402(f) (1) (B).[4] Relevant is United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841 (1964). In that case, the Acme Steel

Company of Canada sold steel strapping to its parent company, Acme Steel Company, Chicago, as a distributor, at a price which was 30 percent lower than the price at which Acme Canada sold the merchandise to users in Canada. It was held that the export price to the United States fairly reflected the market value of the merchandise for two reasons, as set forth by the Second Division in United States v. Acme Steel Company, 50 Cust.Ct. 529, 536–537, 216 F.Supp. 448, A.R.D. 152 (1963), which reasoning was expressly adopted by our court of appeals (51 CCPA at 89):

> After a thorough analysis of the evidence of record and consideration of the arguments of counsel and the cases relied on by the opposing parties, we find that the record amply supports the conclusion of the Customs Court that:
>
>> The record in the instant case does * * * establish that included in the price at which such merchandise is sold for home consumption in Canada were certain selling expenses which were not incurred in export transactions; that the export price differs from the domestic price only to the extent of the value of said expenses; and that the 30 per centum deduction fairly represents the savings in cost effected by the elimination of the several items comprising selling expenses.
>
> It also establishes that the invoice prices were equal to the sum of the production costs, general expenses entering into export transactions and profit, and that such prices

4. The reason for the fairly reflective of market value test was explained thusly: " * * * Congress, in order to provide safeguards against the possible 'rigging' of export value through sales at non-market prices to selected purchasers, introduced into the law a new concept that is applicable *only* in sales to selected purchasers. This new concept is the extension of the definition of 'freely sold or, in the absence of sales, offered for sale' to include the requirement that sales or, in the absence of sales, offerings in the ordinary course of trade at wholesale to the selected customer shall be '*at a price which fairly reflects the market value* * * *'. * * * Only where such market value is fairly reflected in the price paid by the selected customer, is valuation permissible on the basis of export value." Myerson Tooth Corporation v. United States, 61 Cust.Ct. 540, 544, R.D. 11597 (1968). [Emphasis in original.] (Application for review pending.)

fairly reflected the market value for exportation to the United States.

This we consider to be substantial evidence of a price which embodies all of the material elements entering into the new statutory definition of export value in the case of sales to one or more selected purchasers. Accordingly, we conclude, as did the court below, that appellee has sustained its burden of establishing that there was an export value for the instant merchandise and that such value was represented by the invoice and entered values.

In United States v. John V. Carr & Son, Inc., 52 Cust.Ct. 599, A.R.D. 165 (1964) (*affirmed* John V. Carr & Son, Inc. v. United States, 52 CCPA 62, C.A. D. 860 (1965)), the Second Division held that a price which did not include *all* costs did not fairly reflect the market value of the merchandise; but the Division explicitly reaffirmed the rule of the *Acme Steel* case, saying (52 Cust.Ct. at 605):

> Accordingly, we are of opinion that a price which does not embrace all of the elements entering into cost of production does not *per se* fairly reflect the market value of the item sold. This is the tenor of our decision in the case of United States v. Acme Steel Company, 50 Cust.Ct. 529 [216 F.Supp. 448], A.R.D. 152, appeal pending, No. 5145, wherein we held that evidence that invoice prices were equal to the sum of production costs, including material, labor, general expenses entering into export transactions, and profit, was competent evidence from which a price fairly reflective of market value can be determined. * * *

■ The present case differs from *Acme Steel* because International Tubes did not sell the steel tubing in question for home consumption in Canada. However, the second basis of *Acme Steel* is fully applicable here. For here the selling price was "equal to the sum of the production costs * * * general ex-

penses entering into export transactions, and profit * * *." The record also establishes that the selling price here was the result of bona fide negotiations between the parties. For these reasons, we conclude that the present selling prices fairly reflected the market value for exportation to the United States. The fact that the exporter and the importer are related has no bearing on the question of "export value." As the court said in United States v. Acme Steel Company, *supra*, 51 CCPA at 87–88:

> * * * Contrary to the contention advanced by appellant, the fact of the parent and subsidiary relationship existing between the exporter and the importer does not of itself preclude consideration of whether or not there was an export value for the instant merchandise, nor does the fact that the importer was the sole purchaser of the merchandise prima facie affect the question of export value. *To hold otherwise would necessitate reading into the statute by construction a limitation unwarranted by the plain language of the pertinent provisions of the statute.* [Emphasis added.]

■ What is more, appellee-plaintiff did not have the burden, as appellant argues, of accounting for the difference between the selling prices here involved and those at which identical or similar merchandise was sold or offered for sale in Canada by other manufacturers. The market value from which the fair reflection of a price to a selected purchaser is judged need only be the market value of the merchandise produced by the manufacturer involved. In the line of decisions of which *Acme Steel* was the forerunner, the importers attempted to account for the difference between the home consumption prices of the *particular manufacturers* involved in those cases and the export prices to the United States of *those* manufacturers. In some cases the importer was able to account for the differences between the home consumption prices and the United

States export prices of the *particular manufacturers* there involved and therefore prevailed. E. g., United States v. Acme Steel Company, *supra;* American Greiner Electronic, Inc. v. United States, 62 Cust.Ct. 905, 298 F.Supp. 313, R.D. 11658 (1969). (Application for review pending.) In other cases, the decisions went against the importers because they were unable to account for the differences between the home consumption prices and the United States export prices of the *particular manufacturers* there involved. E. g., Union Carbide Corporation v. United States, 58 Cust.Ct. 821, A.R.D. 222 (1967); C. J. Tower & Sons of Buffalo, Inc. v. United States, 58 Cust.Ct. 834, A.R.D. 223 (1967). The point is that the court did not hold in any of these cases that the selling prices of *other* manufacturers had to be accounted for. As the court stated in American Greiner, *supra,* 62 Cust.Ct. at 911, 298 F.Supp. at 318:

> Defendant has made four criticisms of plaintiff's proof. The first would require plaintiff to establish the "market value" in section 402f(1) (B) (of which the invoice price must be a fair reflection) by adducing proof of the prices of other manufacturers of watch timers in addition to that of the manufacturer. Defendant cites in support of this position language in United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841, to the effect that all sales in the ordinary course of trade are proper for consideration in determining a price which fairly reflects the market value. Defendant interprets this to be a requirement that sales of other manufacturers be proved in order to prove market value. Defendant, however, is unjustifiably transforming a permissive rule regarding the scope of evidence into a mandatory one. The court of appeals in *Acme* was responding to an argument, influenced by the thinking under the original language of the appraisement statute, that the market price, of which the invoice price must be a fair reflection, could only be the

manufacturer's price in the *export* market. To this contention our appellate court replied that it was now proper to look to the market value of the manufacturer's goods in the *foreign* market in order to obtain a price from which to judge the "fair reflection." Thus in the granting of permission to consider all sales the emphasis was on all sales *of the manufacturer involved* as opposed to just his export sales and not on all sales in the foreign market by any manufacturer as opposed to all sales in the foreign market by just the manufacturer involved. [Emphasis in original.]

Beyond this, appellant's contention would introduce a new and unreasonable dimension upon an importer in a reappraisement case—a requirement which is not supported by logic, the law, or any court decision. It would be practically impossible to account for the selling price of *other* manufacturers not parties to nor involved in any way in the litigation. To "account" for their prices would require detailed evidence of their costs of production—evidence which manufacturers would be reluctant indeed to reveal to their competitors.

■ Nor is there any such requirement in the statute. As we have seen, the term "such or similar merchandise" for purpose of export value is defined in section 402(f) (4) (A) as meaning *in the first instance* "The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement." Thus in Bjelland & Co. v. United States, *supra,* 48 Cust.Ct. at 598, the court said "the language of section 402(f) (4) requires reference to the statutory value of 'such' merchandise, as defined in section 402(f) (4) (A), before reference can be made to the statutory value of 'such or similar' merchandise, as defined in section 402(f) (4), (B), (C), or (D)." In other words, if an export value exists for merchandise

"identical in physical characteristics with" and "produced in the same country by the same person as, the merchandise undergoing appraisement" (section 402(f) (4) (A)), there is no requirement that any reference be made to the value of merchandise not identical in physical characteristics with the merchandise in issue, or produced by another person.[5]

■ Appellant argues, in addition, that where the manufacturer of the goods undergoing appraisement makes no sales for home consumption, "it is impossible to determine whether the prices charged to the selected purchaser fairly reflect the value of the merchandise in that foreign market except * * * by determining whether those prices incorporate all the elements (including the *usual* profit and general expenses of producers in that foreign market) which would go into constructed value, or both." [Emphasis in original.] However, we do not agree that to prove an *export value* the importer has the burden of establishing the components of *constructed value*. There is no such requirement in the statute. Moreover, such a burden would again add a new and unreasonable dimension to an importer's burden of proof.[6] Appellant also implies that "a" profit or a "modest" profit is not enough. The short answer is that even the present "constructed value" definition—let alone "export value"—contains no requirement for a

minimum profit. This is in contrast to the "cost of production" statute, section 402(f) of the Tariff Act of 1930, which prescribes a minimum profit of 8 percent. We note in passing (as previously set out) that the profit in the present case was 6.92 percent for the 1⅞″ tubing and 6.77 percent for the 2″ tubing.

■ Moreover, even if it were to be assumed that offers or sales by Standard Tube may be considered, the affidavit by its general sales manager is manifestly insufficient to rebut the importer's proof that the selling prices represent statutory export value. First, it is to be noted that that affidavit does not list the sales for home consumption but merely states that except for the special 5 percent discount to "approximately" five buyers, all sales for Canadian consumption were "at prices specified on one of the two attached price lists." Without a list of sales, it is impossible to determine how many buyers actually received the special 5 percent discount, or how many buyers paid the prices shown in the general price list, or how many paid the prices specified in the commodity price list, or what quantities were sold at the 5 percent discount or at the prices shown in the general price list or at the prices shown in the commodity price list. Without this information it is impossible to determine what was the "ordinary course of trade" for Canadian consumption, which would depend at least in part on the quantities sold.

5. As the Tariff Commission pointed out in a statement before the House Ways and Means Committee which was then considering the Customs Simplification Act of 1956: "The sequence of categories provided will make explicit the present interpretation of the phrase to the effect that recourse may be had to 'similar' merchandise in making an appraisement only in the absence of 'such' (identical in physical characteristics) merchandise, and *will add a requirement that merchandise produced by the same person be considered before merchandise produced by another person*." Hearings before House Committee on Ways and Means on H.R. 6040 (84th Cong., 1st Sess., 1955) p. 12. [Emphasis in original.]

6. J. L. Wood v. United States, 58 Cust.Ct. 682, R.D. 11292 (1967), is in no way inconsistent. That case involved the importation of bus shells from Canada which were manufactured there only by the exporter and sold to a corporate affiliate in the United States. The court held that a price which covered actual production costs, general expenses and a profit of 10 percent fairly reflected the market value of the imported bus shells. In so doing, the court rejected defendant's contention that by virtue of the manner of the negotiations regarding profit between the parent corporation of the importer and exporter, the negotiations were not at arm's length.

Bjelland & Co. v. United States, *supra*, 51 Cust.Ct. at 526–527. Nor would it be possible to determine the usual wholesale quantity. C. J. Tower & Sons of Buffalo, Inc. v. United States, 51 Cust.Ct. 329, R.D. 10563 (1963).

Second, it is apparent that the prices shown in Standard Tubes' price lists were not prices which any purchaser in the United States was willing to pay, except for a single sale, and even this sale was for flash-removed grade, whereas the tubing in the present case was flash-in grade. Therefore it is clear that the prices shown in the price lists did *not* reflect the "market value" of the merchandise for exportation to the United States. As this court noted in Superior Merchandise Co. v. United States, 54 Cust.Ct. 781, 787, A.R.D. 185 (1965):

> Market value has been defined as the price at which the manufacturer holds his merchandise for sale, the price at which he freely offers it in the market, and the price which he is willing to receive, *and the purchasers are willing to pay*, in the ordinary course of trade. * * * [Emphasis added.]

The inescapable conclusion is that prices which no purchasers in the United States were willing to pay, except for a single isolated sale, do not represent the market value of the merchandise for exportation to the United States.[7] As between the actual sales by International Tubes for exportation to the United States and the offers for sale by Standard Tube which found no takers in the United States except by a single customer who ordered a single shipment, the actual sales are, as the trial judge put it, "more probative of an export value, at a price that fairly reflects market value, than the offered prices * * *."

██ We next consider whether the trial judge committed reversible error, as appellant insists, in refusing to strike from the record the evidence of the selling prices of steel tubing manufactured and sold in the United States. It is true, as a majority of the court of appeals held—in agreeing with our appellate term—that the "market value of the merchandise" with which section 402(f) (1) (B) is concerned, is the market value of merchandise exported from abroad, and whether or not the price of such merchandise accords with offerings on the American domestic market is an immaterial consideration. See John V. Carr & Son, Inc. v. United States, *supra*, 52 CCPA at 68, affirming United States v. John V. Carr & Son, Inc., *supra*, 52 Cust.Ct. at 606. See also C. J. Tower & Sons of Buffalo, Inc. v. United States, 56 Cust.Ct. 653, 660, R.D. 11152 (1966) (application for review dismissed, 57 Cust.Ct. 749, A.R.D. 213 (1966)). In view of this holding in *Carr*, it is apparent that the evidence here of the selling prices of steel tubing manufactured and sold in the United States is irrelevant on the question of statutory export value. But that does not mean that the evidence is irrelevant for all purposes. Actually such evidence is relevant in determining whether the negotiations which culminated in the invoice prices were bona fide and how such prices were arrived at. It will be recalled that the negotiations between International Tubes and Midas hinged upon the ability of International Tubes to sell the tubing at delivered prices which would be approximately the same as the delivered prices at which the importer could buy similar steel tubing from domestic manufacturers in the United States. The evidence in dispute shows that the invoice prices in this case were in fact competitive with the price of domestic steel tubing in the United States. Not only does this evidence thus show how the invoice prices were fixed, it supports appellee's contention that such prices were the result of bona fide negotiations. Furthermore, the fact that the invoice prices were the result of bona fide negotiations

---

7. It is to be noted that even that sale was for a total of 10,600 feet (see note 2, *supra*) as compared to sales by International Tubes totaling 698,880 feet to International Stamping and 2,194,535 feet to Muffler Corp. See note 1, *supra*.

is relevant in determining whether such prices fairly reflected the market value. See National Carloading Corporation v. United States, 57 Cust.Ct. 758, 765, A. R.D. 215 (1966). This is particularly so when it is observed that market value is "the price at which the manufacturer holds his merchandise for sale, the price at which he freely offers it in the market, and the price which he is willing to receive, and the purchasers are willing to pay, in the ordinary course of trade." Superior Merchandise Co. v. United States, *supra*, 54 Cust.Ct. at 787.

Appellant's last argument is that International Tubes' selling prices to its corporate affiliates, International Stamping and Muffler Corp., do not form a proper basis for dutiable value under section 402 since, it says, dutiable value under that section is the price to all wholesalers buying for industrial use or for resale otherwise than at retail. Appellant, it may be added, made an identical argument before the trial court which the latter rejected. We similarly reject the argument for the following reasons stated by the trial court (60 Cust.Ct. at 723):

> Defendant's argument * * * is a throwback to the cases holding that, under the old valuation statute, the value of merchandise was the price at which all purchasers could buy and not the price to those of a particular class. Substantially the same argument was rejected in W. J. Byrnes & Company v. United States, 50 Cust.Ct. 406, Reap.Dec. 10451, review dismissed, United States v. W. J. Byrnes & Company, 50 Cust.Ct. 574, A.R.D. 158. It is a contradiction to say that, under new section 402, the value of merchandise is the price to all purchasers at wholesale buying for in-

dustrial use or for resale otherwise than at retail, when:

> In contradistinction to the approach obtaining under prior statutes, the new statutory definitions of the phrase "freely sold or * * * offered for sale" authorize consideration of sales to "one or more selected purchasers at wholesale" in the determination of value provided such sales are made in the "ordinary course of trade" at a price which fairly reflects market value and without restrictions as to disposition or use of the merchandise. The record is abundantly clear that the instant sales to Acme, Chicago, the parent company, were not circumscribed by any restrictions as to use or disposition of the merchandise. The statute expressly authorizes sales to a selected purchaser. Contrary to the contention advanced by appellant, the fact of the parent and subsidiary relationship existing between the exporter and the importer does not of itself preclude consideration of whether or not there was an export value for the instant merchandise, nor does the fact that the importer was the sole purchaser of the merchandise prima facie affect the question of export value. To hold otherwise would necessitate reading into the statute by construction a limitation unwarranted by the plain language of the pertinent provisions of the statute. [United States v. Acme Steel Company, 51 CCPA at pages 87, 88.]

We hold, in conclusion, that the invoiced selling prices represent statutory export value. We therefore affirm the judgment of the trial court.