The **AMERICAN GREINER ELECTRONIC, INC.**

v.

**UNITED STATES.**

R.D. 11658; Reappraisement R61/20888.

United States Customs Court.
April 8, 1969.

---

Barnes, Richardson & Colburn, New York City (Joseph Schwartz and Norman C. Schwartz, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

FORD, Judge:

This case is before the court on re-hearing, having originally been decided in The American Greiner Electronic, Inc. v. United States, 57 Cust.Ct. 616, R.D. 11221. The merchandise consists of watch timers of a model designated on the invoice as "Chronografic Record," which were exported from Switzerland on August 10, 1960. Said merchandise was invoiced and entered at 688 Swiss francs, net packed, per unit. It was appraised at 1,590 Swiss francs, net packed per unit, on the basis of constructed value as defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The importer claims that the proper dutiable value is the entered value and bases this claim upon export value as defined in section 402(b) of the Tariff Act of 1930, as amended, *supra,* or in the alternative, upon constructed value as defined in section 402(d), *supra.* The statutory material relevant to the decision is as follows:

Sec. 402. Value

\* \* \* \* \* \*

(b) Export value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordi-

nary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(f) Definitions.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

\* \* \* \* \* \*

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise, \* \* \*.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

In my original opinion, I upheld the action of the appraiser. I rejected plaintiff's challenge based on export value on the ground that insufficient proof was offered to account for the approximately 35 percent difference between the price to the importer as a selected purchaser and the stated home market value. This failure to provide a precise evidentiary delineation of the cost factors which purportedly justified a lower price

to the importer precluded plaintiff from satisfying the statutory requirement that the price in sales to a selected purchaser must fairly reflect the market value.

In the first decision I also rejected plaintiff's challenge based on constructed value on the ground that plaintiff had not shown that it had made diligent efforts to discover the amount of general expenses and profit of other producers of merchandise of the same general class or kind; which requirement is a prelude to the proof called for by the statute that the amounts allocated herein for general expenses and profit were equal to the amounts usually reflected in the sales of other producers.

Plaintiff's request for a rehearing was granted. As a result the record in this case, as it relates to plaintiff's claim under export value was supplemented by the further testimony of Rudolf Greiner, president of the exporter herein and by the introduction in evidence as plaintiff's exhibit 10, of the affidavit of one Ernst Mueller, dated January 5, 1967. Thus, the record may now be summarized as follows: The merchandise in question was produced and exported from Switzerland by Greiner Electronic, Ltd., of Langenthal, Switzerland (hereinafter referred to as Swiss Greiner) 51 percent of whose stock is owned by Rudolf Greiner. It was sold to The American Greiner Electronic, Inc., of Stamford, Connecticut (hereinafter, American Greiner), all of whose stock is owned by Mr. Greiner. The merchandise was sold exclusively to American Greiner in quantities of ten with no further restrictions on disposition or use. The firm is clearly a "selected purchaser" within the meaning of section 402(f) (1) (B) of the Tariff Act of 1930, as amended, *supra.*

In 1960, the year of export, Swiss Greiner sold one watch timer to a Swiss manufacturer of watches at a price of 1,590 Swiss francs, 120 to individual Swiss jewelers for use in watch repair at a price of 1,590 Swiss francs, 140 to Swiss distributors in minimum quantities of ten at a price of 922.21 Swiss

francs and about 140 to American Greiner in minimum quantities of ten at a price of 688 Swiss francs. The price to distributors or wholesalers was for quantities of at least ten instruments. The Swiss wholesale price of 922.21 Swiss francs was reached by a series of deductions from the Swiss retail price of 1,590 Swiss francs; a deduction of 3.6 percent for a Swiss federal tax not incurred in wholesale transactions, a wholesale discount of 33⅓ percent, a quantity discount of 5 percent and a 5 percent cash discount.

The difference remaining of approximately 25 percent between the Swiss wholesale price of 922.21 Swiss francs and the price to American Greiner of 688 Swiss francs was attributed to a differential in the costs incurred in selling in the home market and the costs incurred in selling to the United States. This differential was expressed in plaintiff's exhibit 10, the affidavit of Ernst Mueller, a duly qualified accountant familiar with the financial records of Swiss Greiner. The relevant portion of this affidavit reads as follows:

From the books and records of Greiner Electronic, Ltd., I hereby declare that the company incurred the following selling and distribution costs in connection with the sale of "Chronografic Records" (watch timers) for home consumption in Switzerland during the year 1960:

| 1. Sales organization | | SFr. | % of Sales |
|---|---|---|---|
| 1.1 | Salesmen | 129'000. -- | 7.5 |
| 1.2 | Sales administration | 20'000. -- | 1.2 |
| 1.3 | Warehousing and Handling Expenses | 10'000. -- | 0.6 |
| 1.4 | Transportation | 15'000. -- | 0.9 |
| 1.5 | Credit and Collection Expenses (incl. Financial Expenses) | 48'000. -- | 2.8 |
| 1.6 | General administrative Expenses | 120'000. -- | 7.0 |
| | | 342'000. -- | 20.0 |
| **2. Advertising and Sales Promotion** | | | |
| 2.1 | Advertising | 60'000. -- | 3.5 |
| 2.2 | Exhibitions | 40'000. -- | 2.3 |
| 2.3 | Sales Promotion | 15'000. -- | 0.9 |
| | | 115'000.00 | 6.7 |
| **3. Sales engineering, Service and Warranty** | | | |
| 3.1 | Sales engineering | 30'000. -- | 1.7 |
| 3.2 | Service | 32'000. -- | 1.9 |
| 3.3 | Warranties | 86'000. -- | 5.0 |
| | | 148'000. -- | 8.6 |
| Total | | 605'000. -- | 35.3 |

In other words, the total selling and distribution costs for the Swiss market amounted to 35.3% of gross receipts.

I further declare from an examination of the books and records of Greiner Electronic Ltd., that the total selling and distribution costs

incurred in connection with sales of Chronografic Records during the year 1960 for exportation to the United States were as follows:

1. Sales organization

| | | | |
|---|---|---|---|
| 1.1 | Salesmen | – | – |
| 1.2 | Sales administration | 1'000. -- | 0.4 |
| 1.3 | Warehousing and Handling Expenses | – | – |
| 1.4 | Transportation | 1'000. -- | 0.4 |
| 1.5 | Credit and Collection Expenses (incl. Financial Expenses) | 1'500. -- | 0.6 |
| 1.6 | General administration Expenses | 18'500. -- | 8.1 |
| | | 22'000. -- | 9.5 |

[No expenses were incurred in the remaining categories, according to the affidavit]

In other words, the total selling and distribution costs for exportation to the United States were 9.5% of the gross receipts. The difference of 25.8% represents expenses not incurred in selling to the United States.

———◆———

At the rehearing Mr. Greiner elaborated on the figures in the affidavit as follows: Item 1.1 (Salesmen) covers the wages and traveling expenses of salesmen in Switzerland and was not incurred in the United States due to the fact that Swiss Greiner had no salesmen there. Item 1.2 (Sales Administration) covers clerical salaries and office costs incurred in conducting business correspondence. Such expenses were higher in Switzerland due to the need to follow up offers to sell and a much larger business correspondence. Item 1.3 (Warehousing and Handling Expenses) covers the "stocking" of manufactured instruments and was not incurred in sales to the United States due to the fact that such merchandise was shipped directly upon the completion of production in response to prior orders. Item 1.4 (Transportation) covers the shipment of merchandise to the customers in Switzerland and f. o. b. Zurich airport in sales to the United States. Item 1.5 (Credit and Collection Expenses) covers expenses for "collecting the jewels, watches and back draft losses," which expenses were much lower in sales to the United States due to the absence of bad debts. Item 1.6 (General Administrative Expenses) covers management expenses in connection with sales. These expenses were higher for sales to American Greiner due primarily to the costs of management trips to the United States.

Item 2.1 (Advertising) covers advertising in trade and newspapers which Swiss Greiner did not undertake in the United States. Item 2.2 (Exhibitions) covers exhibitions at the Basel Fair and private exhibitions in Switzerland. Item 2.3 (Sales Promotion) covers "special actions" to promote sales. Item 3.1 (Sales Engineering) covers technical work done for the customers in Switzerland. Item 3.2 (Service) covers the expense of work by service technicians. Item 3.3 (Warranties) covers the warranties given in Switzerland for each instrument sold there. None of the above were incurred in the United States due to the fact that American Greiner handled all such expenses.

Upon reviewing the testimony in this case as it has been supplemented at the

rehearing, I find that plaintiff has supplied evidence regarding export value sufficient to show that the price at which the instant merchandise was sold fairly reflected market value. He has introduced in evidence the particular cost factors which were incurred in lesser amounts or not at all in sales to the United States and this precise evidentiary support adequately reconciles the difference between the invoice price and the Swiss market value. In sum he has shown that the price to the selected purchaser fairly reflects the market value and hence the merchandise is "freely sold" within the meaning of the statute.

Defendant has made four criticisms of plaintiff's proof. The first would require plaintiff to establish the "market value" in section 402f(1) (B) (of which the invoice price must be a fair reflection) by adducing proof of the prices of other manufacturers of watch timers in addition to that of the manufacturer. Defendant cites in support of this position language in United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841, to the effect that all sales in the ordinary course of trade are proper for consideration in determining a price which fairly reflects the market value. Defendant interprets this to be a requirement that sales of other manufacturers be proved in order to prove market value. Defendant, however, is unjustifiably transforming a permissive rule regarding the scope of evidence into a mandatory one. The court of appeals in *Acme* was responding to an argument, influenced by the thinking under the original language of the appraisement statute, that the market price, of which the invoice price must be a fair reflection, could only be the manufacturer's price in the *export* market. To this contention our appellate court replied that it was now proper to look to the market value of the manufacturer's goods in the *foreign* market in order to obtain a price from which to judge the "fair reflection." Thus in the granting of permission to consider all sales the emphasis was on all sales *of the manufacturer involved* as opposed to just his export sales and not on all sales in the foreign market by any manufacturer as opposed to all sales in the foreign market by just the manufacturer involved.

██ To prove the market value of its merchandise as a basis for further computations of export value, plaintiff need only show by satisfactory evidence that a certain price is the price which its product is able to command in the foreign market. The price need not be the same as that of other manufacturers of the same or similar merchandise. Of course if defendant introduces evidence which tends to cast doubt on the genuineness of the foreign market value in question, it may become incumbent upon plaintiff to come forward with further proofs either supporting its similarity to the price of other manufacturers or accounting for its dissimilarity. (For an interesting fact situation where *plaintiff* argued for the use of the price of other sellers in the foreign market and against the use of its own seller's price, see Chr. Bjelland & Co., Inc. v. United States, 52 CCPA 38, C.A.D. 855.

██ Defendant's second criticism is of the expression of elements of cost in plaintiff's exhibit 10 as percentages of gross receipts without proving what the gross receipts were. Defendant contends that this makes the statements in the accountant's affidavit statements of ultimate fact such as were held unacceptable in Brooks Paper Company v. United States, 40 CCPA 38, C.A.D. 495. I find no merit in this argument since the specific cost elements with which the affidavit is concerned are the starting point of a series of logical inferences from which the ultimately issuable fact of "fair reflection" is determined. They are far from being comparable to bold conclusory statements regarding usual wholesale quantities. Moreover I cannot see that independent evidence showing the gross receipts of which they are percentages, would in any way advance or retard their standing as primary evidence from which inferences, chains of reasoning and judgments may reasonably be developed.

Defendant's third contention is that the computations contained in the affidavit placed in evidence as plaintiff's exhibit 10, are tainted by virtue of being based on figures for the entire year of 1960; while the exportation, having been made in August 1960, should have applied to it only computations based on figures prior to August. Defendant draws attention to the statutory language which requires that the sales for export be made "in the ordinary course of trade" which language is defined in section 402(f) (2) as conditions and practices which were normal for a reasonable time prior to the period of exportation in question. I am of the opinion, however, that in the proof of sales costs which account for the difference between home market value and export price, it is not disqualifying to base the computations on financial data which runs somewhat beyond the date of exportation. To begin with, the subject of proof of the affidavit is not a direct statutory term such as "price" and "usual wholesale quantities." I do not consider the time restrictions of the statute to apply as stringently to the item of "fair reflection," which is an approximation, as to the items of price and usual wholesale quantity which are capable of exact measurement. In the absence of proof by the defendant pointing out specific distortions, I find that the percentages based on business figures covering 7 months prior to exportation and less than 5 months thereafter are properly used to account for the differences in the costs of selling to the home market and the United States market.

Furthermore, the subject of proof of the affidavit is not something like the aforesaid "price" or "usual wholesale quantity" which admits of determination as of a fixed time based on documentary or other evidence of commercial transactions prior to that time. The percentage of total receipts which is the method of expressing the various cost factors may only be computable when the gross receipts for the entire year are known. In such a situation it cannot be said that the cost percentages for 1960 are not valid for an exportation in August 1960, unless positive proof is offered pointing out distortions resulting from the use of a yearly base.

Finally, I note that the inclusion of proofs touching on the period after exportation—even with regard to factors susceptible of proof as of that cutoff date —does not always discredit the evidence if it appears that the figures for the subsequent period are part of a consistent and continuous pattern of business behavior. United States v. H. Muehlstein & Co., 42 Cust.Ct. 760, A.R.D. 106. The record herein indicates that the figures for the year 1960 support such a pattern and it would be incumbent upon the defendant if it desired to discredit the accountant's affidavit to show that the pattern of sales expenses changed after the date of exportation.

Defendant's final argument calls for the use of the price to Swiss jewelers of 1,590 Swiss francs as the home market price. This contention, which is not entirely clear, appears to have its origin in testimony by Mr. Greiner at the first trial to the effect that he would consider as "retail sales" sales to manufacturers of watches. I pointed out in the first decision in this case that sales to such manufacturers would, despite the witness' method of categorization, be sales to industrial users and hence potentially sales to wholesalers under the definition of "purchasers at wholesale" given in section 402(f) (3), *supra*. Naturally, had it developed that sales in wholesale quantities were being made to Swiss manufacturers at a price of 1,590 Swiss francs, I might have been led to consider that price as the Swiss market value. See Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, C.A.D. 846. However, the testimony at the rehearing revealed that in 1960 only one sale of one timer at a price of 1,590 Swiss francs was made to a Swiss manufacturer. The record further indicates that the quantity in which the greatest aggregate volume of timers (140) was sold was the quantity of ten and that fourteen sales of ten

timers each were made to Swiss distributors. Consequently, the quantity of ten in which the timers were sold to Swiss distributors is the usual wholesale quantity within the meaning of section 402(f) (5), Tariff Act of 1930, as amended, *supra,* and the price of 922.21 Swiss francs to said distributors has been shown to be the Swiss market value, against which the price to plaintiff can be judged.

■ ■ In sum, plaintiff, after a rehearing, has shown that the difference between the price at which the manufacturer sells to it as a selected purchaser and the price at which the manufacturer sells to its Swiss wholesalers is accounted for by specific differences in the costs incurred in such sales. Plaintiff has successfully proven the nature and amount of these costs and has thus supported its claim of export value.

In light of the above I do not find it necessary to continue to a reexamination of the arguments bearing on constructed value.

On the basis of the record herein, I make the following findings of fact:

■ 1. The merchandise covered by this appeal for reappraisement consists of watch timers exported from Switzerland on August 10, 1960, by Greiner Electronic, Ltd., of Langenthal, Switzerland, and imported by The American Greiner Electronic, Inc., of Stamford, Connecticut.

2. The merchandise is not specified on the Secretary's final list, 93 Treas. Dec. 14, T.D. 54521, and is therefore subject to appraisement under the provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165.

3. Said merchandise was appraised on the basis of constructed value as defined in section 402(d) of said act, as amended, *supra.*

4. During the period in question said merchandise was sold for export only to The American Greiner Electronic, Inc., at a price of 688 Swiss francs per unit.

5. Such sales were in the ordinary course of trade, in the usual wholesale quantities and without restrictions as to disposition or use of the merchandise.

6. During the period in question the market value of such merchandise in Switzerland was 922.21 Swiss francs.

7. The difference between the Swiss market value and the price to the American importer was accounted for by a difference of approximately 25 percent in the costs incurred in selling to the United States.

I therefore conclude as matters of law:

1. Export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra,* is the proper basis for the determination of the value of the merchandise covered by the instant appeal for reappraisement.

2. The invoice value of 688 Swiss francs per unit fairly reflects the market value of the merchandise in question.

3. The invoice value is the export value of said merchandise.