(R.D. 11692)

INTERCONTINENTAL FIBRES, INC. *v.* UNITED STATES

Entry Nos. 743246–1/2; WH 4020–1/2; WH 5008–1/3.

(Decided on rehearing [R.D. 11509] January 22, 1970)

*Lane, Young & Fox* (*James G. McGoldrick* and *William H. Fox* of counsel); *Rode & Qualey*, associate counsel; for the plaintiff.

*William D. Ruckelshaus*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

FORD, Judge: The appeals for reappraisement listed above were the subject of a decision in *Intercontinental Fibres, Inc.* v. *United*

*States*, 60 Cust. Ct. 816, R.D. 11509 (1968). The court upheld the appraised value therein by virtue of the presumption of correctness attaching by law to the action of the appraiser. Such finding was mandatory notwithstanding my finding that the appraised value was incorrect since plaintiff failed to establish the proper dutiable value as required. Subsequently, plaintiff timely moved for a rehearing which was granted.

The involved merchandise consists of three sizes of nylon yarn, 15 denier, 30 denier, and 40 denier, which were appraised on the basis of export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, at $1.95 per pound, $1.53 per pound, and $1.32 per pound, all net packed, respectively. The merchandise does not appear on the final list published in 93 Treas. Dec. 14, T.D. 54521.

Plaintiff does not dispute the basis of appraisement, export value, but claims the proper dutiable values are represented by the entered values of $1.70, $1.28, and $1.15 per pound, net packed for the three sizes respectively.

The pertinent portions of the statutes provide as follows:

Section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such dis-

position or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

In my original opinion, I indicated the issue as follows:

> There is no dispute as to the basis of appraisement, the principal market, or usual wholesale quantity, nor that plaintiff is a selected purchaser. Hence, the issue is narrowed down to the question of whether the nylon yarn is freely sold without restrictions as defined in section 402 (f) and whether the price fairly reflects the market value as well as "ordinary course of trade" as defined, *supra.*

The issue herein remains as stated, *supra.*

By virtue of the record as made, I found in the original opinion as follows:

1. That during the period involved, Chatillon did not offer or sell 15 denier yarn to the United States.

2. That sale of two experimental shipments of 30 denier yarn was not in the ordinary course of trade.

3. That sale of 40 denier yarn was accompanied by restrictions to end users.

4. That plaintiff failed to establish that its contended values fairly reflected the market value in the ordinary course of trade.

In view of this, I found plaintiff had failed to overcome the presumption of correctness attaching to the appraised value notwithstanding the fact that the appraised value had been established to be incorrect. The reason the court held the proof of plaintiff to be insufficient to establish the correct value was set forth in the original opinion as follows:

> The question of whether the price fairly reflects the market value was considered in *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841, wherein the court held it proper to consider any usual transactions in ascertaining the foregoing. The court therein had before it for determination the question of whether evidence of sales in the home market could be considered in a case where appraisement was made on the basis of constructed value and claimed to be properly subject to appraisement on the basis of export value. Evidence relative to sales in the home market was held by the appellate court to be properly subject to consideration by the Customs Court in determining whether the price fairly reflects the market value. The court therein found that sales in the home market at a higher price than those for export was a result of certain enumerated expenses which were not incurred in sales for export. When the additional

expenses, not incurred in export sales, were deducted, the resulting price fairly reflected the sales price involved therein.

Subsequent to the decision in the *Acme* case, *supra*, there were a number of cases which attempted to follow the principles of the *Acme* case, *supra*, which presented evidence of a gross percentage of items of expense not included in export sales. The court has consistently rejected this type of proof as inadequate without a further showing of the amount of the proportion for each expense. *The American Greiner Electronic* v. *United States*, 57 Cust. Ct. 616, R.D. 11221 (rehearing granted); *C. J. Tower & Sons of Niagara, Inc.* v. *United States*, 57 Cust. Ct. 601, R.D. 11212, affirmed A.R.D. 233; *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 56 Cust. Ct. 653, R.D 11152 (application for review dismissed, 57 Cust. Ct. 749, A.R.D. 213).

In the case at bar, the evidence as to the additional expenses incurred in sales in the home market which are not incurred in sales to the United States were set forth in percentages in plaintiff's exhibit 11 as follows:

| | |
|---|---|
| 15 denier | 27½% |
| 30 denier | 21% |
| 40 denier | 21% |

These percentages, in sales in the home market, according to plaintiff's exhibit 11 include selling commission, expenses for credit, discounts, free delivery, free technical advice on the use of the yarn and machinery, free samples and survey, contributions toward customer advertising, considerable marketing, promotion and advertising activity which entails traveling and entertainment expenses by Snia, warehousing, trucking to and from warehouse, and insurance and labor costs in the handling of warehouse goods. Substantially similar statements are also contained in plaintiff's exhibits 9 and 13.  * * *

Based upon this reasoning, I held that following the cases cited, *supra*, I was unable to accept the percentages contained in plaintiff's exhibit 11 as sufficient evidence of fairly reflecting the market value without further allocation of such expenses.

At the rehearing, plaintiff offered as plaintiff's exhibit 17, a supplemental affidavit of Dr. Paleari, the same affiant as in plaintiff's exhibit 11. In this exhibit, the affiant provides a breakdown of the various non-incurred expenses of the involved merchandise when sold to the United States. The following information is contained in plaintiff's exhibit 17 relating to the breakdown of such non-incurred expenses:

My Table A gives a breakdown of the home market prices per pound in U.S.A. dollars for the convenience of the reader. The prices to ICF were in U.S. dollars per pound. The prices in the home market were in Lire per kilogram. The conversion to U.S. dollars was made at the rate of one Lire per U.S. $.0016 or Lire 625 per U.S. dollar.

DISCOUNT: By agreement SNIA sold at net prices to ICF, our U.S.A. wholesaler. There was no competitive or other business reason to set our prices on a discount basis. However, on the contrary, it was SNIA's regular practice to allow discounts to the end-user customers at varying rates depending upon the market. For example, my Table A states the discounts to SNIA's customers in Italy, all of whom are end-user customers.

SELLING COMMISSIONS TO AGENTS: SNAI's agreement with ICF, its U.S.A. wholesaler, makes no provision for SNIA's payment of any selling commissions to anyone. SNIA's agreement with ICF imposes on ICF an obligation to make substantial monthly purchases. There was no need to solicit orders from ICF. On the contrary, SNIA's sales in all other markets to its end-user customers are solicited with considerable energy by commission agents. The commission rates depend upon the respective markets and the deniers.

TECHNICAL ASSISTANCE: Our agreement with ICF, our U.S.A. distributor, made no provision for SNIA to supply or pay for such assistance under any circumstances. The textile fabricators in the U.S.A. market are experienced in the uses of nylon yarns produced by a number of manufacturers. On the other hand, in our other markets, customers and prospective customers use a variety of textile machinery and employ labor with many variations in training and experience. During the January–July, 1962 period, SNIA was promoting its Nylon type 6 yarn under the brand name of LILION to end-user customers who had previously become accustomed to the purchase and use of Nylon type "66" yarn. In order to solicit sales and to stimulate volume which would promote a consistent and regular flow of orders for our LILION brand nylon yarn, it was SNIA's selling and merchandising policy to make available technical assistance to textile fabricators to aid them in the most efficient use of the product. The costs and expenses incurred by SNIA varied in the different markets. My Table A states the unit cost in the home market. Any costs and expenses of similar services in the U.S.A. market were exclusively the costs and expenses of ICF.

SURVEYS & SAMPLES: The agreement with ICF, our U.S.A. distributor, did not obligate SNIA to make or pay for any market surveys for any prospective U.S.A. buyer of LILION, nor did it obligate SNIA to supply samples of its yarn to prospective U.S.A. purchasers. Where such services or goods were deemed necessary to acquire a new customer in the U.S.A., it was ICF's obligation to furnish what it believed was necessary. In the other markets where merchandising was performed by SNIA, it was SNIA's policy to make or participate in market surveys to show a new customer that it had a demand or need for our Nylon type 6 yarn. The same services are provided for an old customer who planned a new product which would increase its purchases of SNIA's yarn. Samples are furnished for similar reasons and can be costly, as a substantial quantity of yarn can be required to adequately test its use on textile machinery or in the production

of a consistently marketable new product. These services are tightly controlled by me as they are subject to excesses, particularly when selling agents are hopeful rather than practical in their efforts.

GENERAL ADVERTISING: SNIA's Nylon type 6 yarn is sold as a brand-name product. The brand name is LILION. It is entirely necessary to advertise a brand-name product generally so that retail consumers will shop for textile products making use of our brand product. SNIA's agreement with ICF does not obligate SNIA to make any expenditures for general advertising in the U.S.A. market. Please note that SNIA did not license ICF to use our brand name LILION in the U.S.A. market. It was SNIA's policy to advertise the LILION yarn in Italy and in several markets where it was desirable to support the demand or where such a programme was believed capable of increasing demand in a substantial quantity.

ADVERTISING ALLOWANCE: These are expenditures made in cooperation with customers. The theory is that both SNIA and the customer will jointly benefit from an advertising programme that features the customer's product and SNIA's LILLION yarn which is the material used in the product. A reference to my Table A as attached will show that it was the SNIA policy to make such allowances in the home market. SNIA found that joint advertising and sales promotions were worthy of consideration in other markets on a limited basis. As before, our agreement with ICF did not obligate SNIA to make any such expenditures in the U.S.A. and SNIA did not make any such expenditures in the U.S.A.

BAD DEBT ADJUSTMENT: ICF was a single, volume purchaser whose credit position was established. SNIA had no obligation under its agreement with ICF to accept any credit risks for yarn sold by ICF to its customers in the U.S.A. ICF sold our Nylon type 6 yarns as the owner (not as our agent) thereby assuming all credit risks on sales to its own customers. It assumed the credit risks on sales to its own customers. SNIA's experience in sales with the various markets serviced by it required the reserve for bad debts included in the prices to such markets.

EXPENDITURES RELATED TO LIMITED QUANTITY SALES: This expense item is incurred mainly in home market sales. It includes a miscellaneous number of costs, charges and expenses which are connected with special handling of small original orders and small supplement orders. These are nuisance sales to supply producers of specialty products of the hand-made and other varieties. These orders require special handling, such as special parcel deliveries, messenger services and special packaging. These charges are high and only SNIA's desire to have good public relations leads to our acceptance of these sales. Our understanding with ICF required all orders of any nature and type from the U.S.A. market to be referred to ICF, so clearly this nuisance expense is not included in our price to ICF.

TRAVEL AND ENTERTAINMENT: The agreement with ICF included no requirement for visits to be made to U.S.A. to promote sales or to do otherwise. It was at all times a necessity for management officials of SNIA to travel to various markets serviced by SNIA for many reasons, all connected with the promotion of sales. The cost of visiting the different markets varied, depending upon the needs of the customers and upon the opportunities estimated to be available to increase our customer list or stimulate a customer's volume or orders.

DELIVERY EXPENSES (INCLUDING WAREHOUSING, FREIGHT, INSURANCE, LABOR): The agreement with ICF, our U.S.A. distributor was for delivery at the SNIA factories with all costs, charges and expenses of delivery to be for the account of ICF. SNIA's sales and distribution policies to markets serviced by it were most different. The prices were either CIF or delivered at the customer's factory. In the home market the prices were delivered at the customer's factory. The need to produce large quantities of Nylon type 6 yarn to obtain efficient production and the circumstances of SNIA customers ordering generally in minimum quantities had the effect of making SNIA a warehouse operator for the inventory of the customers. The minimum quantity orders also increased SNIA's cost of handling in and out of warehouse, the cost of freight, the cost of insurance at the warehouses and in transit. In order to better supply our customers and to limit storage risks, it was our custom to warehouse at different points. However, all these factors tended to increase the cost of distribution to the textile fabricators in all markets. These charges varied depending upon the circumstances in each market.

CUSTOMS DUTIES: This factor was again outside the area of our agreement with ICF, as it took possession of the yarn at our factories. Also, it did not accrue in home market sales. It is hardly necessary to discuss the obligation to pay customs duties when selling goods for delivery at a customer's mill in a foreign country, as SNIA did in some instances.

During the period involved, the unit net receipts were as follows:

|         | 15 denier | 30 denier | 40 denier |
|---------|-----------|-----------|-----------|
| U.S.A.  | $1.70     | $1.28     | $1.15     |
| Italy   | 1.71      | 1.18      | 1.15      |

The affidavit also states that sales of 15 deniers to the United States and in the home market were of a greater volume than sales in the six other markets. The 30 denier sales to the United States and home market were three times greater than in the six other markets and the sale of 40 denier in the home market and United States was about 65 percent of the volume sold in nine other markets. In the sale of 40 denier, the affidavit also states that sales to the United States were 10 times greater than sales in the home market.

Table A referred to in plaintiff's exhibit 17 is as follows.

TABLE A

ANALYSIS—EXPENSES TO MARKET & SELL
TO CUSTOMERS IN ITALY
JANUARY 1 TO AND INCLUDING AUGUST 31, 1962

PRICE PER LB.: 15 DEN.: 1462 LIRE (US $2.35)
30 DEN.: 937 LIRE (US $1.50)
40 DEN.: 900 LIRE (US $1.50)

| | —15 DEN.— | | | —30 DEN.— | | | —40 DEN.— | | |
| | 235 Customers | | | 90 Customers | | | 65 Customers | | |
| EXPENSES | Percent | Lire | US$ | Percent | Lire | US$ | Percent | Lire | US$ |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Discounts | 3 | 43.8 | .07 | 3 | 28.0 | .045 | 3 | 27 | .043 |
| Selling Commissions to Agents | 3 | 43.8 | .07 | 1 | 9.4 | .015 | 1 | 9 | .014 |
| Technical Assistance | 2 | 29.2 | .05 | 2 | 18.6 | .03 | 2 | 18 | .029 |
| Surveys & Samples | 1 | 14.6 | .02 | 1 | 9.4 | .015 | 1 | 9 | .014 |
| General Advertising | 6 | 87.6 | .14 | 6 | 56.8 | .09 | 6 | 54 | .087 |
| Advertising Allowances | 3 | 43.8 | .07 | 1 | 9.4 | .015 | 1 | 9 | .014 |
| Bad Debt Adjustments | 2 | 29.2 | .05 | 1 | 9.4 | .015 | 1 | 9 | .014 |
| Expenditures Related to Limited Quantity Sales | 3 | 43.8 | .07 | 3 | 28.0 | .045 | 2 | 18 | .029 |
| Travel & Entertainment | 1 | 14.6 | .02 | 1 | 9.4 | .015 | 1 | 9 | .014 |
| Delivery Expenses Including Whse., Freight, Insurance, Labor | 3.5 | 51.1 | .08 | 2 | 18.6 | .03 | 3 | 27 | .043 |
| TOTAL Expense to Market & Sell | 27.5% | 401.5 | $.64 | 21% | 197.0 | $.32 | 21% | 189 | $.30 |

Defendant in its brief is of the opinion that some of the non-incurred expenses set forth in plaintiff's exhibit 17 cannot be considered costs incurred in the home market which are not incurred in sales to the United States which would reduce the home market value.

Specifically, defendant contends three of these are not proper. The first which is described as a discount, the second an advertising allowance and the third which relates to sales in limited quantities.

The argument advanced by defendant with respect to the first two categories, discount and advertising allowances, is that such allowances are not expenses incurred by the manufacturer but merely a reduction or discount in the price which it was willing to forego.

While the *Acme* case, *supra*, referred to sales expenses and the case of *John V. Carr & Sons, Inc.* v. *United States*, 52 CCPA 62, C.A.D. 860 (1965), related to fixed expenses, I do not believe the involved two expenses fall within the category of fixed expenses. The discount and the advertising allowance in my opinion do fall within the category of sales expenses. These are expenses which are incurred in sales due to the competitive condition of the market. Freely offered discounts have always been considered and allowed in positively establishing a basis for appraisement as well as for the purpose of establishing whether the price fairly reflects the market value. *J. J. Gavin & Co.*,

*Inc., etc.* v. *United States,* 38 CCPA 69, C.A.D. 441 (1950); *C. J. Tower & Sons of Niagara, Inc., et al.* v. *United States,* 59 Cust. Ct. 681, R.D. 11367 (1967).

Advertising expenses incurred by the manufacturer directly as in the *Acme* case, *supra,* are deemed proper expenses which may be deducted. It is interesting to note that defendant does not attack the directly incurred expenses but only the advertising allowances. I do not see any basic difference between the two when the question relates to fairly reflecting the market value. I am therefore of the opinion that both of these categories are properly subject to deduction as non-incurred expenses for the purpose of determining whether the price fairly reflects the market value.

The third category presents a different question. A claimed deduction of 3 percent in sales of 15 and 30 denier yarn and 2 percent in the sale of 40 denier yarn for limited quantity sales are not in my opinion proper. It is urged by defendant, and properly so, that such sales should not be considered as being in the ordinary course of trade as defined in section 402(f)(2), Tariff Act of 1930, as amended, *supra.* The amount per pound as indicated in the chart referred to as table A of plaintiff's exhibit 17, *supra,* indicates in the case of 15 denier, the sum $.07, in 30 denier $.045, and in the case of 40 denier, the sum of $.029. When these are added back the resultant figures still, in my opinion, fairly reflect the market value. There is no great discrepancy between home market sales and those to the United States. For the purpose of ascertaining whether the price fairly reflects the market value, the net price after deducting non-incurred expenses does not have to equal the price to the United States. The statutory language involved herein is "fairly reflects". Therefore, a figure higher or lower which in the opinion of the court "fairly reflects" is sufficient for this purpose. I accordingly am of the opinion that the price to the United States fairly reflects the market value notwithstanding the fact that the figures for sales in limited quantities are not properly subject to deduction.

Defendant urges that plaintiff has failed to establish that the price to the United States fairly reflects the market value since there is no substantial evidence to establish a net price to third countries but only percentages which were not further elaborated on in plaintiff's additional evidence adduced at the rehearing. While sales in the home market and to third countries may be utilized for the purpose of establishing whether a price fairly reflects the market value it is merely permissive and not mandatory that both prices be established. As long as there is evidence that the price fairly reflects the market value

whether it be by established cost of production, home market sales or third country sales, the court may properly determine this fact. All three categories need not be established to ascertain this fact.

Defendant also contends that sales by Chatillon of similar merchandise should have been shown to be comparable or if not that the difference was due to non-incurred costs. I do not believe this to be necessary as I indicated in my opinion in *The American Greiner Electronic, Inc.* v. *United States*, 62 Cust. Ct. 905, R.D. 11658, 298 F. Supp. 313 (1969) (application for review pending).

Defendant also takes exception to my original finding relating to the sales of experimental shipments by Chatillon of 30 denier yarn and the restrictions to end users imposed by Chatillon with regard to 40 denier yarn. I believe my original opinion clearly sets forth my reasons for such holding which I adhere to.

Based upon the record, I make the following findings of fact:

1. That the merchandise consists of nylon yarn, type 6, in weights of 15 denier, 30 denier, and 40 denier.

2. The merchandise does not appear on the final list promulgated by the Secretary of the Treasury, T.D. 54521.

3. That the parties have stipulated that the basis for appraisement is export value as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165.

4. That the merchandise was appraised on the basis of export value, *supra*, at the selling prices of nylon yarn manufactured by Chatillon for export to the United States at the following prices per pound:

| | | | | |
|---|---|---|---|---|
| 15 denier | United States dollars | | | $1. 95 |
| 30 denier | " | " | " | 1. 53 |
| 40 denier | " | " | " | 1. 32 |

5. That during the period involved, Chatillon did not offer or sell 15 denier yarn to the United States.

6. That two shipments by Chatillon of 30 denier nylon yarn were not in the ordinary course of trade.

7. That sales of 40 denier yarn were restricted to end users.

8. That sales to Intercontinental Fibres, Inc., by Snia Viscosa were for statutory purposes sales to a selected purchaser at wholesale in the ordinary course of trade, without restrictions as to the disposition or use thereof.

9. That the figures of 3 percent on sales in limited quantities of 15 and 30 denier and 2 percent on sales of 40 denier are not in the ordinary course of trade and accordingly not properly subject to be

considered a non-incurred expense for the purpose of determining whether the price fairly reflects the market value.

10. The invoiced prices, at which the merchandise was entered, and which plaintiff claims to represent the export value are:

| 15 denier | United States dollars | $1. 70 |
| 30 denier | " " " | 1. 28 |
| 40 denier | " " " | 1. 15 |

11. The invoiced and entered prices are for statutory purposes prices to a selected purchaser at wholesale in the ordinary course of trade which fairly reflect the market value.

I therefore conclude as matter of law:

1. Export value, as defined in section 402(b), Tariff Act of 1930, as amended, *supra*, is the proper basis of appraisement for the three weights of yarn involved herein.

2. The export value is represented by the entered and invoiced values.

Judgment will be entered accordingly.