(C.D. 4850)

J. E. BERNARD & CO., INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 75-2-00375

(Decided March 28, 1980)

*Stein, Shostak, Shostak & O'Hara, Inc.* (*S. Richard Shostak* and *John N. Politis* at the trial; *Theo B. Audett* with them on the brief) for the plaintiff.

*Alice Daniel,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, Field Office for Customs Litigation (*John J. Mahon* at the trial and on the brief), for the defendant.

FORD, Judge: Plaintiff by this action is contesting the proper dutiable values of various parts of the temperature control systems [1] used in the cabins of DC–9 aircraft manufactured by Douglas Aircraft Co. The imported merchandise was manufactured in Canada by Garrett Manufacturing Ltd., the subcontractor for these parts, shipped to the United States and entered at the Port of Chicago, Ill., by J. E. Bernard & Co., Inc., a customhouse broker, for Douglas Aircraft Co.

The merchandise was appraised on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, at the prices paid by the airlines. Plaintiff agrees the proper basis of appraisement is export value but contends the proper dutiable values are the prices paid by the original equipment manufacturer (OEM), Douglas.

The pertinent portions of section 402 of the Tariff Act of 1930, as amended, *supra*, provide as follows:

> (b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> (f) DEFINITIONS.—For the purposes of this section—
> > (1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
> > > (A) to all purchasers at wholesale, or
> > > (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
> > without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.
> > (2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

---

[1] The parts are identified on the invoices in the entry papers as· 47662–3–sensor; 47676–3– control; 47676–5–1– control temperature; 607146–2–1–control temperature; 607148–1–sensor; 607150–1–1–control temperature; 607152–1–1–temperature selector; 607300–1–1–temperature sensor; and 607702–1–1–temperature control.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

\*     \*     \*     \*     \*     \*     \*

(5) The term "usual wholesale quantities", in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

At the outset of the trial, counsel for the respective parties stipulated and subsequently amended the stipulation as follows:

(1) The merchandise at issue is not on the "Final List," T.D. 54521 and is subject to appraisement under the new law, section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

(2) This merchandise is subject to appraisement on the basis of export value as defined in section 402(b) of said new law, as amended.

(3) The consignee in this case, Douglas Aircraft Co., is an original equipment manufacturer.

(4) The appraisements at issue herein were at unit prices based on the sale to airline purchasers of parts of environmental control systems for DC–9 aircraft identical to the parts at issue herein.

(5) In the event that the airlines which purchased parts of environmental control systems for DC–9 aircraft identical to the parts at issue herein are determined not to be purchasers for industrial use within the meaning of section 402(f)(3), Tariff Act of 1930, as amended, the prices, at the time of exportation to the United States of the merchandise in issue, at which such or similar merchandise was freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus packing, when not included in such prices, and all other costs, charges and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, are the prices paid by the consignee, Douglas Aircraft Co., which is the original equipment manufacturer in this case.

The stipulation of the parties, particularly paragraph 5 thereof, presents a limited issue for determination by the court. The issue so presented is not whether the ultimate consignee and importer is a purchaser for industrial use as the term is utilized in section 402(f)(3), but whether airlines are purchasers for industrial use inasmuch as the appraisement was based upon the prices to airlines,

Based upon the record as made it is not disputed that there are two classes of purchasers of the involved merchandise and two sets of prices. The OEM, Douglas, purchases the complete system, known as ship sets, while the airlines purchase a limited number of replacement parts and never a complete system. The sale price to Douglas is based upon a competitive bid price while those sold to airlines as replacement parts are subject to a pricelist promulgated by the manufacturer, Garrett. It is further established by the record that while Douglas orders complete systems, individual components are shipped as required and each component has a specific price based upon the competitive bid. The airlines, on the other hand, order only those parts it deems necessary for replacement and are billed on the basis of the pricelist for all purchasers other than Douglas.

While neither the record nor the briefs indicate the involved purchases by Douglas to be parts of the complete system and not replacement parts, the court assumes they are components of the complete system. This assumption is based upon the fact of record that Douglas does not supply replacement parts to the airlines who purchase such parts directly from the manufacturer, Garrett.

Whether they are part of the order for the complete system is immaterial since the appraisement was based upon the prices to airlines. There appears to be no question that Douglas is an OEM who utilizes the system in the fabrication of the DC–9 aircraft. It is also apparent that airlines are not OEM's and purchase only for replacement of nonfunctioning parts.

Defendant contends the price to Douglas is not a freely offered price since the price to OEM is a negotiated price and does not qualify for consideration in determining export value. Additionally, defendant contends, since both the OEM and the airlines are industrial users, the only price at which all could purchase is the price to the airlines.

Defendant's position with respect to a negotiated price as not being qualified for determination of export value is based on the fact that it is a price arrived at by bargaining which is not a proper price for value consideration. *F. B. Vandegrift & Co., Inc.* v. *United States*, 56 CCPA 105, C.A.D. 962, 410 F. 2d 1259 (1969); *United States* v. *Mexican Products Co.*, 28 CCPA 80, C.A.D. 129 (1940).

The negotiated price involved herein is on the basis of a competitive bid. Mr. Alec J. Luckevich, assistant to the vice president of Garrett Corp. called on behalf of plaintiff described the process as follows:

> A. Garrett Manufacturing would present a technical proposal to Douglas Aircraft Co. and Douglas Aircraft Co. would then evaluate the technical proposal against others received from competitive suppliers and then select on the basis of both technical proposals and then picks the supplier they desire. In this

particular case it was Garrett Manufacturing, Ltd. which won the award.

A price arrived at in such a manner is not bargaining which would eliminate its use in determining export value.

However, before such price may be utilized it must be determined whether, within the statutory definitions prescribed by section 402(f) and particularly section 402(f)(3) in view of paragraph 5 of the stipulation, there are purchasers who fall within such category.

Section 402(f)(3) defines "purchasers at wholesale" as those "who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail * * *." The court is restricted to this level of purchasers at wholesale by virtue of paragraph 5 of the stipulation. The record is clear that Douglas falls within this level of purchasers at wholesale. Whether the airlines are purchasers for industrial use is not so readily determinable.

In *Ampex Professional Products Co.* v. *United States*, 68 Cust. Ct. 249, R.D. 11765 (1972), *aff'd*, 70 Cust. Ct. 312, A.R.D. 316 (1973), the trial court in considering the question of purchasers for industrial use made the following observations:

> Plaintiff attempts to disassociate these transactions from considerations on various grounds, the primary one being that CBS is not within the first category of "purchasers at wholesale" defined in section 402(f)(3), namely, purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail. The production of taped television programs which are subsequently broadcast over television stations is not, plaintiff urges, an industrial use.
>
> I do not agree. The business of producing network programs for broadcasting on a network affiliate is a known, recognized, albeit occasionally controversial, practice which constitutes a major economic factor in the billion dollar television industry. I am unable to perceive any significant difference, in assaying "industrial use" under the valuation statute, between the use of articles such as the steel strapping involved in *United States* v. *Acme Steel Company, supra* [51 CCPA 81, C.A.D. 841 (1964)], and the articles at bar.
>
> Furthermore, assiduous research into the legislative history of the Customs Simplification Act of 1956 fails to disclose any intent to give the term "industrial use" the narrow meaning ascribed to it by plaintiff. In the absence of such a showing, the appraising officer's presumptively correct finding that CBS purchased the cameras for "industrial use" has not been overcome.

*Ampex* is distinguishable on a number of grounds. As indicated, *supra*, the cameras in *Ampex* produced a product, to wit, network television programs, whereas the airlines in this case merely replaced nonfunctioning parts.

Research of counsel for the parties and the independent research of the court indicate one other case involving the question of pur-

chasers for industrial use. In *American Greiner Electronic, Inc.* v. *United States*, 57 Cust. Ct. 616, R.D. 11221 (1966), *rev'd on rehearing*, 62 Cust. Ct. 905, R.D. 11658, 298 F. Supp. 313 (1969), *aff'd*, 66 Cust. Ct. 644, A.R.D. 289, 328 F. Supp. 498 (1971), *appeal dismissed*, 60 CCPA 185 (1972), the issue involved watch timers. The court in considering the question of industrial use found that a sale to a watchmaker who utilized the timer in the manufacture of watches was a sale to an industrial user. Again a product was produced by utilizing the timer even though the article, the timer, was not consumed. Accordingly, judicial interpretation of the phrase "for industrial use" requires utilization of the purchased article to result in a product.

Airlines do not produce a product by utilization of spare parts purchased for replacement of defective parts of the temperature control system. The products of the airlines, namely, transportation, meals, etc., are not the products of the temperature control system. The same reasoning is applicable even though airlines are considered an industry by the "Standard Industrial Classification Manual" which is designated as major group 45.

Since airlines are not purchasers for industrial use, the court finds, based upon paragraph 5 of the stipulation of the parties, that the prices paid by Douglas are the proper dutiable values.

Judgment will issue accordingly.